Mariano Canales Delgado, demandante y recurrente, *v.* Pan American World Airways, Inc., demandada y recurrida.

*Números:* R-81-12, R-80-318    *Resueltos:* 18 de marzo de 1982

*Herman W. Colberg*, de *Reichard & Colberg* y *Ángel L. Calero*, de *Canales Law Offices*, abogados del demandante recurrente; *Rafael Pérez Bachs*, de *McConnell, Valdés, Kelly, Sifre, Griggs & Ruiz-Suria*, abogado de la demandada recurrida.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

El señor Mariano Canales Delgado contrató con Pan American World Airways, Inc. el transporte aéreo de cuatro maletas. Las maletas, que contenían efectos personales, se transportarían el 20 de enero de 1977 desde Buenos Aires a San Juan, con escala de un día en Caracas. No se solicitó seguro alguno de la carga, aunque en el conocimiento de embarque se proveía oportunidad para pedirlo.

Las maletas llegaron a Puerto Rico el 30 de enero de 1977. Cuando fueron embarcadas pesaban ochenta y dos kilogramos. A su arribo habían sufrido una merma de treinta kilogramos. Los artículos que faltaban valían $5,500.

El señor Canales demandó a Pan American por los daños sufridos, alegando que la pérdida de referencia "se debió a la negligencia exclusiva de la demandada". Tras juicio en su fondo, el Tribunal Superior condenó a Pan American a pagarle al demandante la suma de $5,500, más las costas y $1,000 para honorarios de abogado. Pan American solicitó revisión. Expedimos el auto (recurso R-80-318).

Mientras se perfeccionaba el recurso, tras la correspondiente autorización de este foro, el Tribunal Superior dictó una resolución para reducir su sentencia en la suma de $2,250. El señor Canales había recibido esta cantidad por concepto de los mismos daños, bajo una póliza general de seguros en vigor desde hacía considerable tiempo. El señor Canales solicitó que revisáramos esta resolución (R-81-12). Expedimos el auto y consolidamos ambos recursos.

1. *La caracterización del problema.*

■ El problema central que presenta este caso pertenece al campo del Derecho Internacional Público. El Tratado de Varsovia de 1929, 49 Stat. 3000 *et seq.*, TS 876 (49 U.S.C.A. 1502 *et seq.*) rige los hechos expuestos. Tanto el país de embarque como el de destino de los bienes transportados son signatarios o se adhirieron al Convenio.

Estados Unidos efectuó su adhesión al Tratado en 1934. El acuerdo obligó automáticamente a la Isla al no excluir Estados Unidos a ésta bajo las disposiciones del Art. 40. (¹) El historial del establecimiento del Estado Libre Asociado no contiene indicación alguna de que se quiso afectar la continuada vigencia de tratados localmente aplicables para el 25 de julio de 1952. Véase: *Greig* v. *Srio. de Hacienda*, 86 D.P.R. 345 (1962). Aunque la aplicación del convenio al país de escala carece de pertinencia —véase el Art. 1(2) del acuerdo— Venezuela es signataria del Tratado de Varsovia.

El Tratado de Varsovia fue modificado por el Protocolo de La Haya de 28 de setiembre de 1955 y otros acuerdos. Estados Unidos no es parte de estos otros convenios, sin embargo, a excepción del Acuerdo de Montreal, Agreement CAB 18900 (49 U.S.C.A. 1502, págs. 437–438), el cual no afecta controversias como la que nos ocupa. El tratado multilateral a interpretarse en este pleito es exclusivamente, por tanto, el Tratado de Varsovia. La existencia de este tratado naturalmente suplanta las reglas de Derecho Internacional Privado que de otro modo habría que determinar.

2. *Las disposiciones aplicables del tratado.*

Los artículos más importantes del tratado son, para nuestros fines, el 19, el 20(1), el 22(2) y el 25.

El Art. 19 provee: (²)

El porteador es responsable del daño ocasionado por retrasos en el transporte aéreo de viajeros, mercancías o equipajes.

---

(¹) El Art. 40(1) del Tratado de Varsovia dispone:

"Las Altas Partes Contratantes podrán, en el momento de la firma del depósito de las ratificaciones o de su adhesión, declarar que la aceptación por ellas prestada . . . no se aplicará a todas o parte de sus colonias, protectorados . . . o a cualquier otro territorio bajo su jurisdicción."

(²) Véase, para la versión española, E. Mapelli, *El Contrato de Transporte Aéreo Internacional*, 1968, Madrid, Ed. Tecnos, págs. 309–319.

El Art. 20(1) reza:

El porteador no será responsable si prueba que él y sus comisionados han tomado todas las medidas necesarias para evitar el daño o que les fue imposible tomarlas.

El Art. 22(2) limita la responsabilidad del transportista del modo siguiente:

En el transporte de equipajes facturados y de mercancías, la responsabilidad del porteador se limitará a la suma de doscientos cincuenta francos por kilogramo, salvo declaración especial de interés en el envío hecho por el expedidor en el momento de la entrega de la mercancía al porteador y mediante el pago de una tasa suplementaria eventual. En este caso, el porteador estará obligado a pagar hasta el importe de la suma declarada, a menos que pruebe que es superior al interés real del expedidor en la entrega.

Los francos a que se refiere este artículo son francos Poincaré, integrados por 65 miligramos y medio de oro de novecientas milésimas de fino, lo que equivale hoy a veinte dólares por kilogramo.

El Art. 25 expone las circunstancias en que el porteador no podrá prevalerse de las disposiciones del convenio limitativas de su responsabilidad:

(1) El porteador no tendrá derecho a prevalerse de las disposiciones del presente Convenio que excluyen o limitan su responsabilidad si el daño proviene por su dolo o de faltas que, con arreglo a la Ley del Tribunal que entiende en el asunto, se consideren como equivalentes a dolo.

(2) Les será igualmente rehusado este derecho si el daño ha sido causado en las mismas condiciones por uno de sus agentes obrando en el ejercicio de sus funciones.

Pan American sostiene en este caso que el señor Canales sólo puede recobrar la suma a que se refiere el Art. 22(2). El señor Canales alega que tiene derecho, bajo el Art. 25(1) especialmente, a que se le resarza la totalidad del daño. Este pleito gira principalmente, en consecuencia, sobre el significado de la frase "dolo o de faltas que, con arreglo a

la Ley del Tribunal que entiende en el asunto, se consideren como equivalentes a dolo".

El problema no es sencillo. El texto oficial del Tratado de Varsovia está escrito en francés. El Senado de Estados Unidos confirmó el texto francés y una traducción al inglés, donde el término "dolo" se transcribe como *"wilful misconduct"*. El Tratado de Varsovia se refiere, además, a "dolo o de faltas que, *con arreglo a la Ley del Tribunal que entiende en el asunto*, se consideren como equivalentes a dolo" (énfasis nuestro). ¿Cómo debe interpretarse esta frase clave del tratado? ¿Conforme el Derecho francés, el anglo-americano (la frase *"wilful misconduct"* se originó en Inglaterra, como veremos), el español, en su versión local, o en qué otra forma?

3. *El método de interpretación.*

La práctica usual por largos años en Derecho Internacional Público era intentar reducir a unas pocas reglas sencillas, no exentas de la consiguiente rigidez, las normas para la interpretación de acuerdos internacionales. La práctica no ha desaparecido del todo, pero la tendencia moderna es a reconocer la complejidad del proceso e identificar más bien la multiplicidad de factores, de peso variable, que pueden servir de guía para precisar el significado de un convenio.

Una antigua regla decreta que el significado de las voces empleadas en un tratado se determina mediante referencia al lenguaje en que se redactó. G. Schwarzenberger, *International Law*, 3ra ed., Stevens & Sons, 1957, Vol. I, págs. 503–504. Esta norma conserva su respetabilidad, mas no limita al intérprete a indagar tan solo el significado literal de los términos, sin cruzar la frontera del texto. Hoy se presta atención también, entre otros factores, a las circunstancias en que se negoció el tratado, a su historial, a expresiones de signatarios sobre su entendido del convenio antes de su vigencia y a la práctica subsiguiente de las partes. *Restatement of the Law Second,*

*Foreign Relations Law of the United States*, St. Paul, Am. Law Institute, 1965, Sec. 147; *Simon Maugnie* v. *Compagnie Nationale Air France*, 549 F.2d 1256, 1261, *cert.* den. 431 U.S. 974 (1977). La importancia de los trabajos preparatorios, las minutas y los diversos borradores considerados se viene reconociendo desde hace tiempo. L. Oppenheim, *International Law*, (por H. Lauterpacht), 8va ed., Londres, Longmans, Green & Co., 1955, Vol. I, pág. 957; G. Balladore Palliere, *Diritto Internazionale Pubblico*, 8va ed., Milán, Ed. Giuffrè, 1962, págs. 306-307.

Algunos tribunales estadounidenses han resuelto que el Tratado de Varsovia debe interpretarse conforme el significado de sus palabras en francés. *Burnett* v. *Trans World Airlines, Inc.*, 368 F.Supp. 1152 (1973); *Ricotta* v. *Iberia Líneas Aéreas de España*, 482 F.Supp. 497 (1979); *Block* v. *Compagnie Nationale Air France*, 386 F.2d 323, 330 (5th Cir. 1967), *cert.* den. 392 U.S. 905 (1968).

Otros tribunales en Estados Unidos, así como las cortes inglesas, no se limitan al análisis del texto en francés y en especial exploran el significado del término *"wilful misconduct"* o toman en consideración otras normas interpretativas. *Benjamins* v. *British European Airways*, 572 F.2d 913 (2nd Cir. 1978), *cert.* den. 439 U.S. 1114 (1979); *Reed* v. *Wiser*, 555 F.2d 1079 (2nd Cir. 1977), *cert.* den. 434 U.S. 922 (1977); *Froman* v. *Pan American Airways*, 135 N.Y.S.2d 619 (1954), *cert.* den. 349 U.S. 947 (1955); *Royal Dutch Airline* v. *Tuller*, 292 F.2d 775, *cert.* den. 368 U.S. 921 (1961); *Rosman* v. *Trans World Airlines, Inc.*, 358 N.Y.S.2d 97 (1974); *Grey* v. *American Airlines*, 227 F.2d 282 (2nd Cir. 1955), *cert.* den. 350 U.S. 989 (1956); *Pekelis* v. *Transcontinental & Western Air, Inc.*, 187 F.2d 122 (2nd Cir. 1951); *Horabin* v. *British Overseas Airways Corporation*, [1952] 2 All E.R. 1016; *Ulen* v. *American Airlines*, 7 F.R.D. 371 (1947).

■ Adoptamos la norma de interpretación de tratados más lata y flexible. No nos ceñiremos exclusivamente al

análisis literal del texto en francés. Atenderemos también otros factores que puedan arrojar luz sobre la intención de las partes contratantes. No estamos interpretando una pieza legislativa ordinaria. Estamos interpretando un tratado, que aspira al logro de un sentido uniforme entre países con sistemas jurídicos diversos.

Veremos que las minutas de las sesiones en que se discuten los borradores del Tratado de Varsovia son de particular interés.

### 4. *Las minutas del Tratado de Varsovia.*

La versión preliminar del Tratado de Varsovia, conforme el borrador de mayo de 1928, no empleaba la palabra "dolo", sino la frase "acto intencional ilícito". *Minutes, Second International Conference on Private Aeronautical Law* (trad. de R.C. Horner y D. Legrez), N.J., F.B. Rothman & Co., 1975, pág. 265 (se designa esta obra en adelante como las "Minutas"). El delegado inglés (Estados Unidos no participó en las deliberaciones) protestó el uso de tal frase. Afirmó:

> It is very difficult for us to understand these words "intentional illicit act". It is very difficult for us to know what the word "illicit" accompanied by "intentional" means . . .

> We have at home the expression "wilful misconduct"; I believe that it covers what you mean; it covers not only deliberate acts but also careless acts done without regard for the consequences. *Minutas*, págs. 59–60.

El delegado alemán propuso la utilización del término *"faute lourde"* (culpa grave). *Minutas*, págs. 58–59. El delegado por Luxemburgo explicó que se había recurrido a la frase "acto intencional ilícito" como equivalente del francés *"dol"* (dolo) para facilitar su traducción al inglés, pero que en vista de la dificultad apuntada debía emplearse el concepto de dolo, de fácil comprensión en los países de tradición civilista. *Minutas*, pág. 60.

Georges Ripert, el notable civilista francés, concurrió con la propuesta, pero combatió toda posibilidad de que se utilizase *"faute lourde"* en sustitución de *"dol"* o como su equivalente en significado. El uso del concepto de "culpa grave", señaló, era extremadamente peligroso porque podía inducir a los tribunales a decretar la responsabilidad del porteador cada vez que se cometiese un error serio, en vez de la falta intencional requerida por el dolo. Sugirió Ripert que el asunto se refiriese a un comité para la estructuración de una fórmula general que permitiese la necesaria unidad en la interpretación. *Minutas*, págs. 60–61.

Así se hizo y tal es la razón de la frase adoptada finalmente como parte del Art. 25. El texto en francés de la frase, según aprobado en Varsovia y luego en Estados Unidos, 49 Stat. 3006, dispone:

> Le transporteur n'aura pas le droit de se prévaloir des dispositions de la présente Convention qui excluent ou limitent sa responsabilité, si le dommage provient *de son dol ou d'une faute qui, d'après la loi du tribunal saisi, est considerée comme équivalent au dol.* (Énfasis nuestro.)

La traducción al inglés, según aprobada por el Senado de Estados Unidos, 49 Stat. 3020, es la siguiente:

> The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused *by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct.* (Énfasis nuestro.)

El examen del historial del Tratado de Varsovia lleva en consecuencia a las siguientes conclusiones:

1ra El Art. 25 del Tratado de Varsovia le impone responsabilidad al porteador tan solo en caso de dolo.

2da El dolo entraña mayor culpa que la culpa grave. Los términos no son equivalentes.

3ra Los sistemas jurídicos que desconozcan el concepto del dolo utilizarán su equivalente. El equivalente cumplirá

una misión unificadora. La intención de los países que negociaron el tratado no fue dejar en libertad a los países no civilistas para establecer criterios de responsabilidad totalmente disímiles. La función de los tribunales en estos últimos países es aplicar el principio más análogo en su sistema jurídico a la noción del dolo.

Estas conclusiones exigen que examinemos el concepto del dolo en el Derecho francés y, conforme el mandato del Art. 25, si necesario, en el nuestro.

5. *El dolo en el Derecho francés.*

■ Existen dos tipos de dolo en los países de tradición civilista: el dolo en la formación del contrato, que vicia el consentimiento, y el dolo en el cumplimiento de las obligaciones. Tratamos aquí exclusivamente del segundo tipo de dolo.

■ El dolo contiene, al menos en el uso del término en el Tratado de Varsovia, un elemento de intención o voluntad de hacer daño. J. Hémard, *Les Contrats Commerciaux*, París, Sirey, 1955, pág. 841. Ello lo distingue de la negligencia, aunque ésta alcance el grado de culpa grave o, de ser admisible el término en el Derecho civil o el común angloamericano, de la negligencia crasa. El adagio "culpa lata dolo aequiparatur" (el dolo se equipara a la culpa grave) no tiene vigencia en el Derecho francés sobre el transporte aéreo. G. Marty y P. Raynaud, *Droit Civil*, París, Sirey, 1962, T. II, Vol. 1, págs. 404–408. La historia de la negociación del tratado refuerza, como hemos visto, la distinción entre *dol* y *faute lourde*. *Minutas*, sec. 4. El entendido francés del dolo, dentro del contexto del Tratado de Varsovia, representa "un concepto bien restrictivo, favorable a los porteadores", explica el propio Georges Ripert, delegado francés a Varsovia y participante destacado, como pudimos constatar, en las negociaciones. G. Ripert, *Droit Commercial*, 4ta ed., París, Ed. Pichon y Durand-Auzias, 1960, pág. 239. Véanse, sobre la noción

general del dolo, G. Ripert y J. Boulanger, *Traité de Droit Civil*, París, Ed. Pichon y Durand-Auzias, 1957, T. II, pág. 294 *et seq.;* J. Carbonnier, *Droit Civil*, 1979, Presses Universitaires de France, T. 4, pág. 259 *et seq.;* A. Weill y F. Terré, *Droit Civil—Les Obligations*, 12ma ed., Dalloz, 1975, pág. 445; B. Starck, *Droit Civil—Obligations*, París, Librairies Techniques, 1972, pág. 426 *et seq.;* Mazeaud y Mazeaud, *Leçons de Droit Civil*, París, Montchrestien, 1956, T. 12, pág. 370 *et seq.*

Para probar el dolo hay que demostrar la falta intencional o mala fe de la persona a quien se le imputa, ya que la buena fe se presume. Weill y Terré, *loc. cit.;* Starck, *supra*, pág. 428.

Como cuestión de Derecho interno francés, más que como interpretación de alcance necesariamente internacional, debe señalarse que por ley de 2 de marzo de 1957 se dispuso que el Art. 25 del Tratado de Varsovia significa, al referirse a las "faltas . . . equivalentes a dolo", a la "culpa inexcusable". La culpa inexcusable constituye una falta de gravedad mayor que la *culpa lata* (*faute lourde*). La gravedad debe ser *excepcional* e incluye la falta *deliberada* que implique conciencia de la probabilidad del daño y su aceptación temeraria sin razón válida para ello. Marty y Raynaud, *op. cit.*, pág. 405, n. 3; S. de 24 de junio de 1968 (Corte de Casación de Francia), 1968 R. Dalloz Sirey 569; S. de 11 de mayo de 1970 (Rouen), 1971 R. Dalloz Sirey, Somm. 114; S. de 28 de febrero de 1973 (Civ. 1re), 1973 R. Dalloz Sirey, Inf. Rap. 96; M. de Juglart y B. Ippolito, *Droit Commercial*, París, Montchrestien, 1974, pág. 560 *et seq.* [3]

6. *El dolo en nuestro derecho.*
   a) *La vertiente civilista.*

---

[3] El Protocolo de La Haya modifica el Art. 25 del Tratado de Varsovia, pero huelga discutirlo aquí en vista de su inaplicabilidad en Estados Unidos y en Puerto Rico.

■ El concepto del dolo en nuestro Derecho civil está naturalmente influido por la teoría francesa, vía su recepción en España. El dolo en el cumplimiento de las obligaciones se equipara con la mala fe y se compone de dos elementos, según ha apuntado Vázquez Bote, "el intelectual (o conciencia de una actuación inconforme) y el volitivo (o voluntad de actuar de dicho modo inconforme)". E. Vázquez Bote, *Derecho Civil de Puerto Rico*, San Juan, Ed. Jurídicas, T. III, Vol. 1, págs. 241–242.

■ El dolo entraña malicia, "la intención de causar un mal a la persona o a la propiedad ajena. En esto se diferencia fundamentalmente el dolo de la negligencia y de la morosidad. . . ." Q. M. Scaevola, *Código Civil*, 2da ed., Madrid, Ed. Reus, 1957, T. XIX, págs. 617–618. El dolo en el cumplimiento de las obligaciones es la omisión consciente y voluntaria del obligado de cumplir con su obligación, a sabiendas de que realiza un acto injusto. F. Puig Peña, *Tratado de Derecho Civil Español*, Madrid, 1974, T. IV, Vol. 1, pág. 280; J. Castán Tobeñas, *El Derecho Civil Español, Común y Foral*, Madrid, Ed. Reus, 1974, T. 3, pág. 195; J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1976, T. I, Vol. 2, págs. 504–505. Véanse: *Soto* v. *Lucchetti*, 58 D.P.R. 713, 720 (1941); *Galarza Soto* v. *E.L.A.*, 109 D.P.R. 179, 182 (1979). El concepto del dolo (en el cumplimiento de las obligaciones) en el Derecho civil español y el puertorriqueño no se diferencia perceptiblemente del francés, excepto que no existe legislación aplicable en Puerto Rico para crear la figura de la "culpa inexcusable". La carga de la prueba recae sobre quien reclama la existencia de dolo. E. Mapelli, *El Contrato de Transporte Aéreo Internacional*, Madrid, Ed. Tecnos, pág. 236.

b) *La vertiente del Derecho común.*

En vista que el Tratado de Varsovia nos remite al concepto de "dolo o de faltas que, con arreglo a la Ley del

Tribunal que entiende en el asunto, se consideren como equivalentes al dolo", todo indica que la noción civilista del dolo es la aplicable en este caso, ya que en Puerto Rico, contrario a la casi totalidad de los estados norteamericanos, es innecesario buscar un equivalente de esa figura jurídica.

Podría argüirse, no obstante, que el concepto aplicable en Estados Unidos es el de *wilful misconduct* y que Puerto Rico es parte de Estados Unidos en el sentido internacional, si no el doméstico, para los fines de un tratado, salvo reserva en contrario. No es necesario expresarnos sobre la solidez o endeblez de este argumento, ya que el resultado a que se llega en este pleito es idéntico, así se emplee el concepto de dolo o el de *wilful misconduct.*

Por *wilful misconduct* se entiende generalmente en Estados Unidos una falta cometida intencionalmente o con menosprecio temerario de sus consecuencias. Véanse: *Pekelis, Ulen* y la larga lista de casos citados junto a ellos, *ante,* Sec. 3. Como se desprende de las minutas del Tratado de Varsovia, la traducción de "dolo" contiene un elemento de deliberación. Se buscaba un criterio más restrictivo que el de la negligencia o aun de la culpa grave. De ahí que en Estados Unidos se hable de falta intencional o menosprecio temerario de las consecuencias. Ni la negligencia más crasa satisface el criterio del menosprecio temerario. *Froman* v. *Pan American Airways,* 135 N.Y.S.2d 619 (1954), *cert.* den. 349 U.S. 947 (1955). El actor tiene que haber intentado el resultado o actuado con conocimiento de la consecuencia probable de sus actos, mas con temerario menosprecio de ello. Adviértase que este criterio alternativo contiene también elementos de intención y deliberación. Véase: Note, *Aviation Law: Attempts to Circumvent the Limitations of Liability Imposed on Injured Passengers by the Warsaw Convention,* 54 Chi.-Kent L. Rev. 851, 861 *et seq.* (1978); *Berner* v. *British Commonwealth Pacific Airlines, Ltd.,* 346 F.2d 532 (2nd Cir. 1965); *Grey* v. *American*

*Airlines*, 227 F.2d 282 (2nd Cir. 1955), *cert.* den. 350 U.S. 989 (1956).

"*Wilful misconduct*", así como "dolo", según lo demuestran las minutas del Tratado, representan un criterio restrictivo. Este dato, junto a otras consideraciones, causó la adopción de una nueva redacción del Art. 25 del Convenio de Varsovia en el Protocolo de La Haya de 28 de setiembre de 1955, el cual elimina la referencia al dolo o las faltas equivalentes a él. Ya indicamos, sin embargo, que Estados Unidos no ha efectuado su adhesión a este Protocolo, por lo que no puede considerarse para los fines de este caso. También es de notar que, contrario al caso francés, no existe legislación doméstica que interprete la expresión "dolo" o "*wilful misconduct*" en el contexto del Tratado de Varsovia.

A la luz de lo anterior, no es de extrañar que sean contadísimos los casos en Estados Unidos en que se ha invocado con éxito el Art. 25 del Convenio para imponerle responsabilidad ilimitada al porteador de mercancías o equipaje. *Cohen* v. *Varig Airlines*, 15 Av. 17,112 (S.Ct. App. Div., 1978); *Kupferman* v. *Pakistan International Airlines*, 438 N.Y.S.2d 189 (1981); *Compañía de Aviación Faucett* v. *Mulford*, 386 So.2d 300 (D.C. App. Fla. 1980). Para algunos de los casos en que se limita la responsabilidad, véanse: *International Mining Corporation* v. *Aerovías Nacionales de Columbia*, 15 Av. 17,511 (N.Y.S. Ct., App. Div. 1978); *Olshin* v. *El Al Israel Airlines*, 15 Av. 17,463 (E.D.N.Y. 1979); *Rymanowski* v. *Pan Am. World Airways, Inc.*, 416 N.Y.S.2d 1018 (1979), confirmado: 427 N.Y.S.2d 795 (1980); *Eve Boutique Imports, Inc.* v. *Seaboard World Airlines, Inc.*, 10 Av. 17,703 (N.Y.S. Ct. 1968); *Danziger* v. *Compagnie Nationale Air France*, 16 Av. 17,261 (S.D.N.Y. 1979).

7. *La aplicación de los criterios expuestos al caso de autos.*

█ Los preceptos descritos exigen valoración independiente en cada caso concreto. Las circunstancias y naturaleza del daño, junto a otros factores, pueden afectar el análisis a realizarse. En este caso específico, referente a la morosidad en la entrega de bienes muebles y a la sustracción en ruta de parte de ellos, el récord está carente de prueba indicativa de conducta dolosa por parte del porteador. Cabe, a lo sumo, una inferencia de actuación negligente, que es lo que permite la imposición de responsabilidad hasta el límite dispuesto por el Art. 22(2), mas no existe base para determinar que ocurrió dolo o *wilful misconduct* dentro del contexto del Art. 25 del Tratado de Varsovia. Falta al menos el elemento volitivo, la culpa intencional, la conciencia de que se estaba actuando indebidamente, a riesgo considerable para el expedidor, acompañada del menosprecio temerario de lo que probablemente podría ocurrir. Contrástese este caso con el de *Cohen* y el de *Rymanowski,* supra. En el estado actual del vetusto Tratado de Varsovia no es posible, en estricta juridicidad, imponerle responsabilidad ilimitada al porteador en las circunstancias de este recurso (R-80-318).

8. *El recurso R-81-12. La improcedencia de la doble indemnización.*

█ El expedidor se queja de que el Tribunal Superior haya deducido de su sentencia original las sumas cobradas por él de su compañía de seguros. No tiene razón. Se trata aquí de un seguro contra pérdida de cosa. No se admite generalmente la acumulación de beneficios en tales circunstancias. *Futurama Import Corp.* v. *Trans Caribbean,* 104 D.P.R. 609 (1976).

En conclusión, por las razones expresadas, *se confirmará la resolución recurrida en el recurso R-81-12 y se modificará la sentencia dictada en el recurso R-80-318 para reducir la cuantía concedida a la cantidad máxima recobrable bajo el Art. 22(2) y (4) del Tratado de Varsovia.*

El Juez Asociado Señor Díaz Cruz no intervino.