ESTELLA TOPPEL, demandante y recurrente, *v.* MILTON TOPPEL, demandado y recurrido.

*Número:* R-83-130        *Resuelto:* 10 de noviembre de 1983

776

*Víctor M. Pons., Jr.* y *Mario L. Paniagua,* de *Sweeting, Pons, González & Cestero,* abogados de la recurrente; *David Rivé Rivera,* abogado del recurrido.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

Este caso brinda la oportunidad de reexaminar dos de las cuestiones más discutidas en el derecho internacional privado: la norma conflictual que rige la distribución de los bienes al divorciarse los cónyuges y la regla aplicable cuando median en tal situación las circunstancias conocidas como "el conflicto móvil". (¹)

1—*Los hechos.*

Estella Webb, ciudadana británica residente en la ciudad de Nueva York, contrajo matrimonio el 19 de mayo de 1957 en esa ciudad con Milton Toppel, estadounidense residente en Nueva Jersey. Tras algunas semanas en Nueva York, la pareja se trasladó, en julio de 1957, a Puerto Rico donde permanecieron domiciliados hasta septiembre de 1970. En

---

(¹) El término "conflicto móvil" se utiliza en esta opinión para designar aquellos casos en que ha habido cambios en el domicilio conyugal o del centro de intereses del matrimonio.

esta fecha el matrimonio se mudó a Nueva York, mas en agosto de 1975 el señor Toppel regresó a San Juan, donde ha residido hasta el presente.

Al contraer nupcias, el señor Toppel contaba con bienes ascendentes a $10,000. En Puerto Rico, a través de los supermercados Pueblo y empresas relacionadas, los esposos Toppel acumularon una fortuna considerable. Tan solo una minúscula parte de ésta es de naturaleza inmueble.

El 18 de agosto de 1981 la señora Toppel obtuvo sentencia de divorcio en Puerto Rico. El 21 de diciembre de 1982, en sentencia separada, el Tribunal Superior resolvió que el matrimonio de los Toppel no estuvo nunca sujeto al régimen de la sociedad de gananciales, según establecido en nuestro Código Civil, pues, a su juicio, el régimen económico del matrimonio queda fijado definitivamente por la ley del varón al contraerlo. El tribunal concluyó a continuación que los bienes muebles le pertenecen al esposo, pero que los bienes inmuebles sitos en Puerto Rico deben distribuirse conforme al régimen ganancial puertorriqueño. La señora Toppel ha acudido en alzada ante este foro.

*2–Normas conflictuales aplicables.*

*a) Ausencia de tratado o legislación sobre el asunto.*

■ Nuestra primera tarea es determinar si el asunto que nos ocupa ha sido objeto de tratado, como ocurrió en *Canales* v. *Pan American,* 112 D.P.R. 329 (1982). Varios convenios —entre ellos el Tratado de Derecho Civil Internacional de Montevideo de 1889; el Código Bustamante de 1928; el Tratado de Montevideo de 1940; las convenciones de La Haya de 12 de junio de 1902, 17 de julio de 1905 y 14 de marzo de 1978— tratan aspectos del régimen matrimonial de bienes, pero no se han hecho aplicables a Puerto Rico.

Como segundo paso hay que dirigirse entonces a las reglas conflictuales de nuestro Código Civil. Su Art. 9 (31 L.P.R.A. sec. 9) expresa:

> Las leyes relativas a los derechos y deberes de familia, o al estado, condición y capacidad legal de las personas, obligan a los ciudadanos de Puerto Rico, aunque residan en países extranjeros.

El Art. 10 (31 L.P.R.A. sec. 10) dispone:

> Los bienes muebles están sujetos a la ley de la nación del propietario; los bienes inmuebles, a las leyes del país en que están sitos.

Por último, el Art. 1277 (31 L.P.R.A. sec. 3561) provee:

> Si el casamiento se contrajere en país extranjero, entre puertorriqueño y extranjera o extranjero y puertorriqueña, y nada declarasen o estipulasen los contratantes relativamente a sus bienes, se entenderá, cuando sea puertorriqueño el cónyuge varón, que se casa bajo el régimen de la sociedad de gananciales, y cuando fuere puertorriqueña la esposa, que se casa bajo el régimen del derecho común en el país del varón; todo sin perjuicio de lo establecido en este título respecto de los bienes inmuebles.

■ Si la interpretación de las leyes exigiese tan solo el análisis literal del texto, sin referencia a la realidad histórica y social que lo produjo, tal parecería que el Art. 10 o el 9 o una combinación de ambos gobierna el caso de autos. A poco que se indague la historia de estos artículos, equivalentes a los Arts. 9 y 10 del Código Civil español,[2] se advertirá que las normas expuestas en ellos no se refieren al régimen matrimonial de bienes y, mucho menos, al problema del conflicto móvil.

El sentir general de los comentaristas es que, antes de la reforma de 1974, el Título Preliminar del Código Civil español no contenía ningún principio conflictual alusivo al caso del régimen matrimonial de bienes, aunque algunos estiman que el Art. 9 era aplicable. J. M. de Lasala Samper,

---

[2] Respecto al Art. 10 existen diferencias entre los dos códigos que no son pertinentes a este caso. En 1902, Puerto Rico omitió las referencias en el Código Civil español a las sucesiones legítimas y a las testamentarias y a la situación de los sometidos al fuero de Vizcaya.

*El Régimen Matrimonial de Bienes*, Barcelona, Ed. Bosch, 1954, pág. 205; A. Miaja de la Muela, *Derecho Internacional Privado*, 9na ed. rev., Madrid, Ed. Atlas, 1982, T. 2, pág. 372; M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Jaén, Ed. Revista de Derecho Privado, 1978, T. 1, pág. 153; E. Pecourt García, *Derecho Internacional Privado Español*, Pamplona, Ed. Univ. de Navarra, 1976, Vol. I, pág. 135; J. Verplaetse, *Derecho Internacional Privado*, Madrid, Imp. Estades, 1954, págs. 412-413.

La única norma conflictual sobre la materia, según ese sentir, era la incompleta del Art. 1.325 del Código Civil español, equivalente a nuestro Art. 1277, antes transcrito. El Art. 1.325 no nos indica qué ocurre cuando se producen cambios en la nacionalidad, el domicilio o los intereses de los cónyuges. De Lasala Samper, *op. cit.*, págs. 205-206. Nuestro Art. 1277 no es aplicable a este caso, de todos modos, porque no se trata aquí de casamiento en que uno de los cónyuges es puertorriqueño.

La naturaleza fragmentaria de las reglas conflictuales españolas legisladas es conocida. J. A. Carrillo Salcedo, en *Comentarios a las reformas del Código Civil*, Madrid, Ed. Tecnos, 1977, Vol. 1, pág. 401. Los Arts. 9 y 10 del Código Civil español cubrían una zona muy reducida. Veamos brevemente su origen e historia para precisar las fuerzas a que respondieron y la naturaleza de su alcance.

b) *Historia de la doctrina estatutaria. Su inaplicabilidad a este caso.*

Aunque las Siete Partidas contenían referencias al problema del conflicto móvil —véanse la Partida IV, Título II, Ley 4 y la Partida IV, Título XI, Ley 24— las leyes de Partidas quedaron pronto sin efecto sobre este particular a partir de la recepción de la doctrina estatutaria, producto inicialmente de los glosadores. J. L. de los Mozos. *Derecho Civil Español*, Salamanca, Imp. Kadmos, 1977, T. 1, Vol. 1, pág. 735.

Los "estatutos" eran originalmente las leyes de las ciudades italianas, donde nació la doctrina que luego se extendería por Europa. La doctrina postulaba al comienzo que los estatutos eran de dos tipos: reales o personales —más tarde se añadiría una tercera clasificación, el estatuto mixto. El estatuto real regulaba las cosas, muebles o inmuebles, particularmente las segundas. El estatuto personal se refería a las personas, rigiéndolas dondequiera que fuesen. La creación del estatuto personal se explica por el renacimiento del derecho romano, con todo su prestigio, y el concepto de que éste representaba la ley común que acompañaba la persona. El desarrollo posterior de la idea de la nacionalidad alteraría el contenido de esa ley. El estatuto real se concibió como límite al estatuto personal. El feudalismo fue su razón de ser. Era imprescindible al bienestar del sistema que los bienes, en especial los inmuebles, se gobernasen por las leyes del territorio donde radicasen.

La doctrina de los estatutos generó innumerables versiones a través de los siglos, pero el dato esencial es que su contorno común obedece a las necesidades de una sociedad estática, de orden básicamente feudal. J. M. Trías de Bes, *Derecho Internacional Privado*, 2da ed., Madrid, Inst. Reus, 1935, pág. 18 y ss.; De Lasala Samper, *op. cit.*, pág. 29 y ss. Sobre ella se ha escrito que fue "la predominante hasta el siglo XIX", pero que es "[i]mprecisa para ser una doctrina orgánica e insuficiente para solucionar las cuestiones prácticas del Derecho internacional privado". Trías de Bes, *op. cit.*, pág. 24. "La doctrina científica actual", afirma Manresa, "sin dejar de reconocer el enorme progreso que en su época supuso la teoría de los Estatutos para el desarrollo del Derecho internacional, la considera de todo punto inadmisible . . .". J. M. Manresa, *Comentarios al Código Civil Español*, 7ma ed., Madrid, Inst. Ed. Reus, 1956, T. 1, pág. 215.

No se cita lo anterior para que se descarten los Arts. 9 y 10 de nuestro Código Civil, todavía aplicables a muchas

situaciones, sino para que no se extienda la arcaica doctrina estatutaria más allá de sus límites históricos.

Como hemos señalado antes, la teoría de los estatutos no se diseñó para resolver los conflictos de leyes en la zona del régimen de los bienes matrimoniales, fuese durante el matrimonio o al repartir éstos por razón de divorcio. Los Arts. 9 y 10 del Código Civil español, tal y como leían antes de la reforma de 1974, derivan de la doctrina estatutaria. El hecho de que el divorcio era desconocido en España para el tiempo en que se aprueba el Código Civil basta de por sí para demostrar que, al menos en cuanto a tal aspecto, estamos ante una laguna de la ley. El historial legislativo inmediato, anterior y posterior, del Código Civil español de 1889 revela, de todos modos, la existencia y extensión de la laguna. Está admitido que ni el proyecto de Código Civil de 1821, ni el de 1836, ni el de 1851, ni el de 1869 contenían reglas sobre los efectos patrimoniales del matrimonio o el divorcio. A. Marín López, en *Comentarios a las reformas del Código Civil*, supra, pág. 441. Desde temprano, no obstante, se propusieron artículos equivalentes a los Arts. 9 y 10 del Código de 1889. Véanse, por ejemplo, los Arts. 8 y 9 del proyecto de 1851, F. García Goyena, *Concordancias, motivos y comentarios del Código Civil español*, Madrid, Imp. Soc. Tipográfico-Editorial, 1852, T. 1, págs. 20–21, y los Arts. 10 a 12 del proyecto de 1869, 34 Rev. Gen. de Leg. y Jur. 383–384 (1869) (se reproduce aquí el texto completo del Título Preliminar y del Libro Primero propuestos).

■  Fue precisamente para llenar esta laguna que se enmendó en 1974 el Título Preliminar del Código Civil español para añadir, entre otros referentes a otros temas, el Art. 9.3, el cual dispone:

Las relaciones patrimoniales entre los cónyuges, a falta o por insuficiencia de capitulaciones permitidas por la ley de cualquiera de ellos, se regirán por la misma ley que las relaciones personales. El cambio de nacionalidad no alterará el régimen económico matrimonial, salvo que así lo acuerden los cónyuges y no lo impida su nueva ley nacional.

Dada la inaplicabilidad de los Arts. 9 y 10 del Código Civil a las circunstancias de este caso, el Art. 7 del Código Civil, 31 L.P.R.A. sec. 7, gobierna como en toda otra situación la formulación de la regla conflictual a aplicarse aquí, conforme a equidad.

c) *Normas utilizadas en otras jurisdicciones.*

Tanto en el derecho civil como en el común existe gran variedad de puntos de vista sobre la solución más justa del problema ante nosotros. E. Rabel, *The Conflict of Laws*, 2da ed., Ann Arbor, Univ. of Michigan Law School, 1958, Vol. 1, pág. 353 y ss. Veamos las tendencias sobresalientes.

La solución española, representada por el Art. 9.3, recién citado, ha sido criticada severamente aun en la propia España. Carrillo Salcedo ha escrito, *op. cit.*, pág. 409:

> Lo primero que llama la atención es que a la altura de 1974 se haya mantenido una ordenación y distribución de materias de clara raíz estatutaria y no civilista, con lo que, en un momento en que los sistemas estatutarios son un recuerdo histórico —se diga lo que se quiera de su eventual reactualización doctrinal—, *la reforma española nace con un marcado signo de anacronismo.* (Énfasis en el original.)

Miaja de la Muela, *op. cit.*, pág. 376, expresa:

> El criterio retenido por el legislador español, tanto respecto de la ley aplicable al régimen matrimonial legal como respecto de la solución del conflicto móvil, no responde a las tendencias más recientes de la codificación interna e internacional en la materia.

A continuación Miaja de la Muela expone su preferencia, en casos de nacionalidad mixta, por la ley del domicilio o residencia habitual de los cónyuges, "conexión mucho más respetuosa con el principio de igualdad de los esposos . . .". Respecto al conflicto móvil estima que los peligros de fraude a los derechos de uno de los cónyuges, entre otros factores, aconsejan la adopción de soluciones más matizadas. *Loc. cit.* Para otras críticas igualmente severas de la reforma de 1974, véanse: Mozos, *op. cit.*, pág. 738; J. Castán

Tobeñas, *Derecho civil español, común y foral*, 12ma ed., Madrid, Ed. Reus, 1982, T. 1, Vol. 1, págs. 655–656. A crítica análoga se expone el Art. 19 del Código Civil italiano de 1942 al establecer que las relaciones patrimoniales de los cónyuges se regulan por la ley nacional del marido al tiempo de la celebración del matrimonio, sin que el cambio subsiguiente de ciudadanía de los cónyuges pueda alterar el régimen incial. G. Balladore Pallieri, *Diritto Internazionale Privato Italiano*, Milán, Ed. Giuffrè, 1974, pág. 203.

En lo que toca a las relaciones patrimoniales de los cónyuges, los países civilistas latinos no aplican generalmente el estatuto real, el cual retienen, de conformidad con sus orígenes y desarrollo, para otros fines. Rabel, *op. cit.*, pág. 366; F. Andrade Pires de Lima e João de Matos Antunes Varela, *Código Civil Anotado*, Coimbra, Ed. Coimbra, 1967, Vol. 1, págs. 43–45. Existe también la tendencia a no distinguir entre bienes muebles e inmuebles para el propósito que nos ocupa y a escoger una sola ley, a veces de aplicación compleja, para regir las relaciones patrimoniales entre los cónyuges. I. García Velasco, *Concepción del derecho internacional privado en el nuevo Código Civil portugués*, Salamanca, 1971, pág. 44.

El desarrollo del derecho francés sobre la materia es de particular interés, dada su influencia inicial sobre el Código Civil español.

El Art. 3 del Código Civil francés dispone en parte, desde 1804 hasta el presente:

> Los inmuebles, incluso los poseídos por extranjeros, se rigen por la ley francesa.
>
> Las leyes relativas al estado y capacidad de las personas obligan a los franceses, aunque residan en país extranjero. (Traducción nuestra.)

Estos dos apartados del Art. 3 reflejan la doctrina estatutaria y constituyen los precedentes de los Arts. 9 y 10 del Código Civil español, con una diferencia importante. El Código Civil francés no fija una regla conflictual para los

bienes muebles. La doctrina y la jurisprudencia pronto se ocuparon, no obstante, de aplicar el estatuto real tanto a bienes muebles como inmuebles. H. Batiffol y P. Lagarde, *Droit International Privé*, 7ma ed., París, Ed. Pichon y Durand-Auzias, 1981, T. 1, págs. 327-328; *Code Civil 1982*, París, Ed. Litec, comentarios, pág. 20.

La doctrina más favorecida finalmente en Francia, sin beneficio de legislación, fue la del centro, sede o localización de los intereses matrimoniales. La frase se remonta a sentencias del siglo diecinueve, G. Wiederkehr, *Les Conflits de Lois en Matière de Régime Matrimonial*, París, Librairie Dalloz, 1967, pág. 158, pero en 1961 es que se le consagra finalmente por la Corte de Casación. Civil, 7 de noviembre de 1961, *Revue Critique de Droit International Privé* 1962.687, en nota de Batiffol; Wiederkehr, *op. cit.*, pág. 157.

Tal doctrina funciona en ausencia de capitulaciones matrimoniales. Se aplica a todas las clases de bienes que compongan el patrimonio conyugal. La doctrina es distinta a la que convierte el domicilio o residencia habitual de los cónyuges en el factor determinante en todos los casos, teoría que todavía goza de influencia. La regla del centro de los intereses reconoce que el domicilio o residencia habitual representa un interés de peso considerable y, en muchos casos, aun decisivo, pero examina también la índole y fortaleza de otros lazos. Los intereses pecuniarios son también importantes. Hay que determinar, entre otros factores, si el domicilio se establece en forma definitiva o por duración relativamente larga; dónde está sita la residencia habitual, cuando se cuenta con casas en distintos lugares; dónde radica el grueso de los intereses pecuniarios; dónde es que el matrimonio ha producido sus bienes. La solidez de los lazos se calcula usualmente en derecho francés en términos de duración. El fin de la norma es que los esposos se rijan por la ley que más se adapte a su situación particular. Wiederkehr, *op. cit.*, págs. 155-168, 325-331.

En Canadá se ha considerado que el darle preeminencia

a la ley domiciliar del marido al momento del matrimonio o tiempo después conflige con la política de emancipación e igualdad de la mujer. Se ha sostenido al efecto que, existan o no capitulaciones matrimoniales, el régimen matrimonial debe gobernarse por las leyes relativas a los contratos, debiendo prevalecer la ley conectada más sustancialmente con el contrato. J.-G. Castel, *Canadian Conflict of Laws*, Toronto, Ed. Butterworths, 1977, Vol. 2, págs. 414, 420.

La tendencia en Québec es a designar, para fines del conflicto móvil o modificación del régimen matrimonial, la ley del primer domicilio conyugal común o, en su defecto, la que gobierna el régimen matrimonial. Éste se determina por la doctrina del centro de gravedad de los intereses conyugales. Office de Révision du Code Civil, *Rapport sur le Code Civil du Québec*, Québec, 1977, Vol. 1, Arts. 21, 26, págs. 600–602; y el Vol. 2, T. 2 (*Commentaires*), págs. 993, 995. En Québec tampoco se distingue entre bienes muebles e inmuebles para los fines que nos ocupan. Para el resto de Canadá se ha sugerido la abolición de la antigua regla del derecho común sobre el particular. Castel, *op. cit.*, pág. 420.

El derecho común inglés distinguía desde sus comienzos entre la propiedad real y la personal. Su segunda característica consistía en la posición privilegiada en que se colocaba al marido respecto al patrimonio conyugal. El derecho común de los primeros tiempos —aún quedan importantes rezagos de desigualdad— le reconocía al varón la posesión y el uso de todos los bienes inmuebles de su esposa, fuesen adquiridos antes o después del matrimonio. Respecto a los bienes muebles, tangibles o intangibles, el varón adquiría la propiedad absoluta, aunque primero tenía que colocar bajo su posesión los intangibles. El derecho inglés fue evolucionando hacia el reconocimiento de intereses separados. H. Marsh, *Marital Property in Conflict of Laws*, Seattle, Univ. of Wash. Press, 1952, pág. 14. El derecho actual inglés tiende a utilizar la *lex situs* para determinar el derecho de los cónyuges a inmuebles, y la ley del domicilio con-

yugal para regir el derecho a los bienes muebles, hayan sido adquiridos antes o después del matrimonio. Por "domicilio conyugal" se entiende, sin embargo, el domicilio del marido al ocurrir el matrimonio. Cuando hay un cambio subsiguiente de domicilio rige la ley del nuevo domicilio, excepto en lo que atañe a los derechos adquiridos bajo la ley del domicilio anterior. *Dicey and Morris on the Conflict of Laws*, 10ma ed., Londres, Ed. Stevens & Sons, 1980, Vol. 2, págs. 667-673.

En el derecho norteamericano se ha retenido, aunque bajo crítica crecientemente intensa, la distinción conflictual inglesa entre bienes muebles e inmuebles. En tiempos de Beale y la primera reformulación del derecho en este campo, las reglas reflejaban la teoría territorialista de Beale y su noción de los derechos adquiridos. Los derechos de los esposos sobre los inmuebles se gobernaban, en consecuencia, por la ley del lugar donde se hallaban. La ley del domicilio del marido al momento del matrimonio regía los intereses sobre los muebles adquiridos antes de su celebración y la ley del domicilio del cónyuge adquirente imperaba en el caso de los muebles obtenidos después. *Restatement of the Law of Conflict of Laws*, St. Paul, Minnesota, American Law Institute Publishers, 1934, Secs. 237, 238, 289 y 290.

Al aprobarse la segunda reformulación se mantuvo el dominio de la *lex situs* respecto a los inmuebles, con la excepción norteamericana impuesta por la teoría de la procedencia de los fondos. En lo que concierne a los muebles se adoptó una solución más flexible, comparable a la francesa. Los bienes muebles, existentes al tiempo del matrimonio o adquiridos después, se rigen por la ley del estado que tenga la relación más significativa con los esposos y los bienes. El peso mayor se le reconoce usualmente al estado donde estaban domiciliados los cónyuges al momento de adquirir el inmueble, en el caso de los bienes adquiridos después. Otros contactos dominantes son, como en el caso de

cualquier otro contrato: las necesidades de los sistemas interestatal e internacional; las políticas pertinentes del foro; las políticas pertinentes de otros estados concernidos y su interés en la decisión del asunto; la protección de las expectativas justificadas de las partes; las políticas básicas que animan el campo del derecho concernido; la certeza, predecibilidad y uniformidad del resultado y la facilidad de aplicación de la ley resultante. *Restatement, Second, Conflict of Laws* Secs. 6, 233, 234, 257 y 258 (1971).

La posición del segundo *Restatement* sobre los inmuebles ha sido particularmente objeto de crítica, así como la supervivencia de la vieja distinción entre muebles e inmuebles. Marsh, *op. cit.*, pág. 110; R. Weintraub, *Commentary on the Conflict of Laws*, 2da ed., Mineola, The Foundation Press, 1980, págs. 429–431; J. Sampson, *Interstate Spouses, Interstate Property, and Divorce*, 13 Tex. Tech L. Rev. 1285, 1313 *et seq.* (1982); R. Leflar, *American Conflicts Law*, 3ra ed., New York, Ed. Bobbs-Merrill Co., 1977, págs. 341–343; A. Ehrenzweig, *A Treatise on the Conflict of Laws*, St. Paul, Minnesota, West Publishing Co., 1962, págs. 648–649.

Es de advertir también que en Estados Unidos sólo quedan tres estados en que se aplica el derecho común "puro" sobre esta materia (Mississippi, Virginia y West Virginia). La comunidad de los bienes conyugales se reconoce en ocho (Louisiana, Texas, New Mexico, Arizona, Nevada, California, Idaho y Washington). Sampson, *op. cit.*, págs. 1324–1325. Para la debida protección de la mujer, además, se ha creado en algunos estados de la Unión Americana el concepto de la propiedad "cuasiganancial". En California, por ejemplo, se dispone que será considerada "cuasiganancial" toda propiedad inmueble sita en el estado y toda propiedad mueble, dondequiera que se encuentre, adquirida por cualquier cónyuge no domiciliado en California, si es que la propiedad se consideraría ganancial de haberse adquirido por un residente de California. La propiedad cuasiganancial tiene que dividirse por igual entre los cónyuges en caso

de divorcio, tal como si se tratase de bienes ganaciales. La constitucionalidad de esta legislación ha sido sostenida. *Addison* v. *Addison*, 399 P.2d 897 (1965). Véase: Comment, *Marital Property and the Conflict of Laws: The Constitutionality of the "Quasi-Community Property" Legislation*, 54 Calif. L. Rev. 252 (1966). Los tribunales de Nuevo Méjico han alcanzado el mismo propósito de igualdad entre los esposos sin necesidad de legislación. Comment, *In-migration of Couples from Common Law Jurisdictions: Protecting the Wife at the dissolution of the Marriage*, 9 N.M.L. Rev. 113 (1978–79).

El pensamiento norteamericano sobre el derecho internacional privado ha evolucionado dramáticamente a partir de la época de Joseph Beale. Walter Wheeler Cook, Brainerd Currie, Elliott Cheatham, Willis Reese, Maurice Rosenberg, Albert Ehrenzweig, David Cavers, Robert Leflar, Arthur Von Mehren, Donald Trautman y Russell Weintraub, entre otros, han rechazado la doctrina territorialista de Beale, con su corolario teórico de los derechos adquiridos, y han estructurado nuevas teorías. Por regla general se ha abandonado, por ineficaz e injusta, la búsqueda de un solo factor como clave para la solución de problemas multiestatales. Se reconoce, en distintas formas, la necesidad de enfocar muchos de los problemas en este campo a través del análisis funcional de los diversos valores que afectan cada tipo de situación. En este sentido se observa una tendencia del derecho común y del civil a confluir en ciertos puntos. La teoría de los contactos dominantes es en extremo parecida, por ejemplo, a la del centro de intereses. Es posible estructurar, a la luz de lo anterior, una serie de principios generales que, entre otros, servirán para atender situaciones como la presente.

d) *Definición de las normas.*

■ 1ª Las doctrinas conflictuales, como tantas otras, generalmente responden, en mayor o menor medida, a las corrientes sociales e ideológicas de la época en que se gene-

ran, aunque tienden a sobrevivir a veces la realidad que las produjo.

2ª La teoría estatutaria es ejemplo de esa supervivencia injustificada, especialmente cuando se pretende aplicarla a situaciones para las cuales no se diseñó, tales como los efectos patrimoniales del casamiento y el divorcio, dentro o fuera del conflicto móvil.

3ª No existe justificación histórica o actual para el tratamiento distinto en casos como el presente de los bienes, muebles o inmuebles, que compongan el patrimonio conyugal. Tal justificación puede existir en otros contextos.

4ª Debe distinguirse entre diferentes situaciones conflictuales, aun dentro del mismo campo. Los valores envueltos en situaciones distintas o aun superficialmente similares son numerosos y la relación entre ellos varía a menudo. La certeza y la predecibilidad son valores de gran peso, pero están necesariamente subordinandos a los de la justicia. En materia de conflictos de leyes se ha dicho que la simplificación excesiva representa el método más certero de convertir un problema difícil en uno insoluble.

5ª El derecho internacional privado es una disciplina que se rige en Puerto Rico, en ausencia de tratado, por el Código Civil, pero las reglas conflictuales contenidas en éste son de índole tan fragmentaria que hay que apelar muchas veces a los principios generales del derecho. Las técnicas del derecho comparado ayudan usualmente a la identificación de esos principios.

En consecuencia sentamos las siguientes reglas:

1ª Los efectos del matrimonio y el divorcio sobre el régimen de los bienes conyugales presentan problemas conflictuales propios, cuya solución no debe encomendarse a la doctrina estatutaria.

2ª Aun dentro del campo reducido a que hace referencia la regla anterior, los principios que aquí se reseñan regirán tan solo la relación ínter vivos de los

cónyuges entre sí. No se hace aquí expresión alguna sobre las reglas aplicables cuando el pleito es entre terceros acreedores y los cónyuges o cualquiera de ellos. Tampoco sobre problemas sucesorios.

3ª La unicidad del patrimonio matrimonial, abrumadoramente favorecida por los países civilistas, constituirá también la regla puertorriqueña. El reciente Convenio de La Haya sobre regímenes matrimoniales reitera la norma de la unicidad. El propío relator del segundo *Restatement*, Willis Reese, apoyó, en nombre de Estados Unidos, el borrador del Convenio. W. Reese, *The Thirteenth Session of the Hague Conference*, 25 Am. J. Comp. L. 393 (1977).

4ª Se adopta la doctrina del centro de los intereses matrimoniales, con los refinamientos que aporta el pensamiento norteamericano sobre los contactos dominantes en el caso de los bienes muebles y otros ajustes que se desprenden de lo que sigue.

5ª Toda regla conflictual —fenómeno frecuente en el derecho— encierra el peligro de convertirse en pura norma mecánica. De ahí que su propósito cardinal no deba nunca perderse de vista. La razón de ser en Puerto Rico de la doctrina del centro de los intereses matrimoniales estriba en la necesidad de lograr la igualdad entre los esposos y proteger a la mujer, por tantos siglos marginada, contra posible manipulación de las normas, y otras injusticias. La evaluación de los intereses se hará en cada caso con tal objetivo en mente. Más adelante se discute la relación entre ese propósito y nuestro ordenamiento jurídico.

6ª Entre los intereses privados y públicos a examinarse se cuentan: el domicilio o residencia habitual de los cónyuges, factor que merecerá especial consideración; la localización principal de los intereses pecuniarios, en términos mayormente del centro de sus inversiones e ingresos activos y no de sus entradas pasivas; la localización de sus lazos afectivos; la duración de su residencia en distintos lugares, la fortaleza de los lazos creados en esos sitios; la

nacionalidad de las partes; las necesidades de los sistemas interestatal e internacional; las políticas pertinentes del foro; las políticas pertinentes de otros estados afectados y su interés en la decisión del asunto; la protección de las expectativas justificadas de las partes; las políticas básicas que animan el campo concernido; la predecibilidad y uniformidad del resultado en situaciones análogas; la protección de la parte más débil; y la aplicación, conforme a Leflar, de la regla más justa.

7ª Los mismos intereses ayudarán al análisis del conflicto móvil, aunque su peso relativo puede cambiar conforme a las circunstancias. Adoptamos al respecto la regla de la mutabilidad limitada. La variante representada por el Art. 7 del convenio de La Haya merecerá especial consideración. (³) En cuanto a la diferencia entre las teorías de la inmutabilidad, la mutabilidad completa y la limitada, véanse: Marsh, *op. cit.*, pág. 103 *et seq.*; Castle, *op. cit.* pág. 424; Rabel, *op. cit.*, pág. 380 *et seq.* La mutabilidad limitada reconoce que puede haber un cambio de régimen, en ausencia de capitulaciones matrimoniales, si es que median ciertas circunstancias que cambien el centro de gravedad del matrimonio.

---

(³) El Art. 7 dispone:

"The law applicable under the Convention continues to apply so long as the spouses have not designated a different applicable law and notwithstanding any change of their nationality or habitual residence.

"Nonetheless, if the spouses have neither designated the applicable law nor concluded a marriage contract, the internal law of the State in which they both have their habitual residence shall become applicable, in place of the law previously applicable—

"1 when that habitual residence is established in that State, if the nationality of that State is their common nationality, or otherwise from the moment they become nationals of that State, or

"2 when, after the marriage, that habitual residence has endured for a period of not less than ten years, or

"3 when that habitual residence is established in cases when the matrimonial property regime was subject to the law of the State of the common nationality solely by virtue of sub-paragraph 3 of the second paragraph of Article 4."

*3–Aplicación al caso de las normas establecidas.*

Los esposos Toppel, aunque de ciudadanía diversa, establecen verdaderamente su primer domicilio conyugal en Puerto Rico. Recién casados en Nueva York, se trasladan a esta isla a las pocas semanas. Llegan con poco dinero. Aquí conviven desde 1957 hasta 1970. Aquí se produce su fortuna. Aquí nacen sus hijos. Aquí tienen ambos su residencia habitual hasta que resuelven habitar en Nueva York. Aquí regresa el señor Toppel a vivir desde 1975 hasta la fecha del divorcio en 1981. Aquí trabaja mayormente el señor Toppel desde 1957 hasta el divorcio. El grueso de los ingresos conyugales derivó del esfuerzo realizado en Puerto Rico. No hay indicio en autos de intención conyugal de cortar sus fuertes lazos sociales, afectivos y económicos con Puerto Rico al trasladarse a Estados Unidos o expectación real y legítima mutua de cambiar en virtud de tal acto el régimen matrimonial a otra ley que no fuese la puertorriqueña. Es inescapable concluir ante estas circunstancias que el centro de gravedad del matrimonio fue Puerto Rico.

Examinemos, no obstante, los otros factores enumerados para determinar si ellos contrarrestan en conjunto la conclusión preliminar expresada. Veremos que, por el contrario, la refuerzan. En lo que respecta a las políticas pertinentes del foro, Puerto Rico tiene una fuerte política en favor de proteger a la mujer y de equiparar la esposa al esposo. El Art. II, Sec. 1 de la Constitución de Puerto Rico expresa en parte que "Todos los hombres [léase 'seres humanos'] son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de . . . sexo . . .". Numerosas leyes se han aprobado al amparo de esta legislación. Véanse, entre muchas otras, la Ley Núm. 20 de 5 de agosto de 1975, enmendadora de la Núm. 3 de 13 de marzo de 1942 (29 L.P.R.A. sec. 467), sobre el período de descanso para las obreras en estado grávido; la Ley Núm. 58 de 22 de junio de 1975 (29 L.P.R.A. sec. 146) y la Núm. 5 de 14 de octubre de

1975 (3 L.P.R.A. sec. 1311) contra el discrimen por razón de sexo en el trabajo y el servicio público; la Ley Núm. 51 de 21 de mayo de 1976 (31 L.P.R.A. sec. 284) para decretar la coadministración por ambos cónyuges de la sociedad legal de gananciales; la Ley Núm. 111 de 2 de junio de 1976 (31 L.P.R.A. sec. 283) para disponer que los cónyuges decidan, por mutuo acuerdo, dónde establecer el domicilio y residencia en la consecución de los mejores intereses de la familia; la Ley Núm. 84 de 30 de mayo de 1976 (31 L.P.R.A. secs. 342–344) que equipara a los cónyuges en las medidas provisionales durante el procedimiento de divorcio o nulidad de matrimonio; la Ley Núm. 112 de 2 de junio de 1976 (31 L.P.R.A. sec. 343) que le reconoce al marido los mismos derechos que a la mujer respecto a la pensión alimenticia; la Ley Núm. 109 de 2 de junio de 1976 (31 L.P.R.A. sec. 282) que equipara a los cónyuges en lo que toca a la obligación de protegerse y satisfacer sus necesidades mutuamente. Consúltense también nuestras decisiones en *Zachry International* v. *Tribunal Superior,* 104 D.P.R. 267 (1975); *González* v. *Tribunal Superior,* 97 D.P.R. 804 (1969); *Milán Rodríguez* v. *Muñoz,* 110 D.P.R. 610 (1981); *León Rosario* v. *Torres,* 109 D.P.R. 804 (1980); *Wackenhut Corp.* v. *Rodríguez Aponte,* 100 D.P.R. 518 (1972); *Com. de la Mujer* v. *Srio. de Justicia,* 109 D.P.R. 715 (1980); *Banco de Ahorro del Oeste* v. *Santos,* 112 D.P.R. 70 (1982).

La existencia en el foro de una política pública de tal vigor no significa que todo matrimonio residente o que haya residido en Puerto Rico, no importa las circunstancias, queda sometido, en ausencia de capitulaciones, al régimen legal de la sociedad de gananciales. Cada caso tendrá que examinarse a la luz de sus circunstancias particulares. La existencia de tal política reforzará necesariamente, sin embargo, el principio de igualdad entre los esposos cuando la conexión con este foro sea, como aquí, sólida y dominante.

Respecto a las necesidades de los sistemas interestatal o internacional, no hay nada en los principios expuestos que

las ofenda. En cuanto al sistema interestatal, hemos visto que California y Nuevo Méjico, entre otros estados, le extienden a la mujer a través del concepto de propiedad cuasiganancial aun mayor protección que la que le brinda su sistema de comunidad de bienes. La regla del centro de intereses que hemos reconocido es, además, esencialmente análoga a la de los contactos dominantes, adoptada por el *Restatement* para los bienes muebles poseídos por el matrimonio. *Green Giant Co.* v. *Tribunal Superior*, 104 D.P.R. 489 (1975) (opinión del J. Torres Rigual). En lo que respecta al sistema internacional, el principio motor de la igualdad del ser humano es parte de la Declaración Universal de los Derechos del Hombre.

Si examinamos el interés de otros estados en la decisión de este asunto difícilmente puede argumentarse que Nueva York tenga lazos más estrechos que Puerto Rico con el matrimonio en este pleito. Los contactos con Puerto Rico, ya analizados, son claramente dominantes.

Los otros factores relacionados anteriormente tampoco logran, según se desprende de autos, inclinar la balanza hacia el otro lado. ¿En dónde radica la justicia, en casos como el presente, de extraer del caudal matrimonial los bienes muebles para sujetarlos a un régimen distinto al prevaleciente en el lugar con vínculos más estrechos con el matrimonio?

Respecto al problema del conflicto móvil, no puede decirse que el domicilio conyugal estuvo localizado inicialmente en Nueva York. Consta en autos que aun antes de la boda se anunció que la pareja residiría en Puerto Rico. En lo que toca al traslado a Nueva York en 1970, lo que ocurre a todas luces es, a lo sumo, un cambio de residencia o domicilio, lo cual no basta necesariamente para alterar de por sí el centro de los intereses matrimoniales, conforme los factores que hemos analizado. Si se atiende únicamente la regla un tanto rígida del Convenio de La Haya, antes citada, tampoco se dan en este caso las circunstancias que

permitan concluir que hubo un cambio en la ley que gobernaba el régimen matrimonial. El establecimiento en 1970 de un posible domicilio conyugal en Nueva York fue por un término demasiado corto para poder resolver, dentro de las circunstancias específicas de este caso, que hubo un cambio de régimen matrimonial.

*Se revocará en consecuencia la sentencia recurrida.* El patrimonio matrimonial está sujeto al régimen puertorriqueño de sociedad legal de gananciales. Tanto los bienes inmuebles como los bienes muebles, tangibles o intangibles, adquiridos durante el matrimonio se distribuirán conforme a las normas que rigen la liquidación de tal género de sociedad.

La conclusión alcanzada afecta el resultado o, a veces, el razonamiento tan solo de algunas decisiones nuestras. Quedan afectadas especialmente las de *Babilonia* v. *Registrador*, 62 D.P.R. 688 (1943); *Fenning* v. *Tribunal Superior*, 96 D.P.R. 615 (1968); y *Pueblo* v. *Denis Rivera*, 98 D.P.R. 704 (1970). Se les revoca en cuanto sean incompatibles con esta opinión.

Los Jueces Asociados Señores Negrón García y Rebollo López concurren en el resultado sin opinión.