Opinión disidente emitida por la
Juez Asociada Señora Rodríguez Rodríguez.
Disiento de la opinión del Tribunal. Considero que la opinión mayoritaria enmarca erradamente la controversia en este caso en el derecho internacional privado de contra-tos entre cónyuges, cuando de lo que se trata es de una *141 controversia de derecho internacional privado de derecho de familia relativa a la división de bienes matrimoniales. El error conceptual de la mayoría, entre otras cosas, lo lleva a revocar un precedente de hondo calado, Toppel v. Toppel, 114 D.P.R. 775 (1983), sin que ello fuera necesario y bajo un razonamiento, a mi juicio, tanto deficiente como insuficiente. El asunto que debemos abordar versa sobre el carácter privativo o ganancial de un inmueble sito en el estado de Florida, cuando una pareja se estableció en más de una jurisdicción durante la vigencia de su matrimonio. Específicamente, debemos resolver qué efecto tiene, sobre la naturaleza ganancial o privativa de un inmueble, el que una pareja de puertorriqueños que contrajo matrimonio en Puerto Rico bajo el régimen legal de gananciales y poste-riormente estableció su residencia en Florida, otorgue un contrato para transferir su titularidad de manera exclu-siva a uno de los cónyuges. Asimismo, nos compete deter-minar mediante qué ley se debe realizar el procedimiento de clasificación y división de los bienes, incluyendo el in-mueble sito en Florida.
Repasemos los hechos en este caso.
I
Carlos Roselló Puig y Ruth N. Rodríguez Cruz se casa-ron en Puerto Rico bajo el régimen de la Sociedad Legal de Bienes Gananciales. Luego de varios años de convivencia en la isla, la pareja se mudó a Florida. Allí compraron un inmueble que les sirvió como hogar familiar durante los años de residencia en ese estado. El 29 de abril de 1997, la titularidad que ambos cónyuges ostentaban sobre el in-mueble se transfirió a favor de la señora Rodríguez Cruz exclusivamente, a cambio de diez dólares, mediante escri-tura pública, conforme autorizan las leyes de Florida. Más adelante, las partes regresaron a Puerto Rico. El matrimo-nio se disolvió mediante sentencia de divorcio el 7 de abril *142 de 2003, por la causal de separación. Posteriormente, la señora Rodríguez Cruz vendió el inmueble sito en Florida.
El 27 de octubre de 2003, el señor Roselló Puig presentó una demanda ante el Tribunal de Primera Instancia, en la que solicitó la división de la comunidad postganancial. En-tre sus alegaciones, aseveró que pagó el préstamo hipote-cario del inmueble ubicado en Florida hasta agosto de 2003, fecha en que la señora Rodríguez Cruz lo vendió por la suma de $450,000. También adujo que, como el inmueble se adquirió durante la vigencia del matrimonio, la propie-dad le pertenecía a la Sociedad Legal de Bienes Ganancia-les y él tenía derecho al 50% del dinero producto de la venta.
Luego de varios eventos procesales, la señora Rodríguez Cruz presentó una moción de sentencia sumaria en la que solicitó que se reconociera la naturaleza privativa del in-mueble sito en Florida. El 4 de abril de 2005, el Tribunal de Primera Instancia dictó una resolución en la que dispuso que el inmueble era un bien privativo porque el señor Ro-selló Puig había cedido su parte a favor de la señora Rodrí-guez Cruz mediante un negocio jurídico válido, según las leyes de la jurisdicción donde ubica el inmueble.
Insatisfecho, el señor Roselló Puig presentó un recurso de certiorari ante el Tribunal de Apelaciones. Alegó que las donaciones o compraventas entre cónyuges que contraen matrimonio bajo el régimen de Sociedad Legal de Bienes Gananciales están prohibidas por nuestro ordenamiento, aunque se trate de un inmueble sito fuera de Puerto Rico.
En su sentencia, el Tribunal de Apelaciones revocó el dictamen del foro inferior. Concluyó que la “cesión o trans-ferencia simulada” no alteró la naturaleza ganancial del bien, pues el Artículo 11 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 11, establece que las leyes prohibitivas rela-cionadas a las personas, sus actos o sus bienes no quedan sin efecto por leyes o sentencias dictadas en países extranjeros. Sin embargo, el foro intermedio reconoció la validez de la venta del bien inmueble a un tercero. Asi- *143 mismo, determinó que la pareja mantuvo su domicilio con-yugal en Puerto Rico y que no se apartó del Derecho puertorriqueño. Por lo que concluyó que, en la relación en-tre sí, los cónyuges continuaban sujetos a las leyes relati-vas a la Sociedad Legal de Bienes Gananciales y la comu-nidad posganancial. También señaló que el dinero obtenido de la compraventa sustituyó el bien, por lo que se debía incluir como un activo ganancial al que tienen derecho los excónyuges, por partes iguales.
De esta sentencia acudió ante este Tribunal la señora Rodríguez Cruz. En su recurso de certiorari, la peticionaria aduce que el foro intermedio obvió el principio lex rei sitae que recoge el Artículo 10 del Código Civil, 31 L.P.R.A. see. 10. Además, indicó que la determinación del foro interme-dio viola las doctrinas de conflicto de leyes, la cláusula de entera fe y crédito y la igual protección de las leyes. Por su parte, el recurrido alegó que el régimen económico matrimonial seleccionado a la fecha del matrimonio es el que debe aplicar para la división de bienes, por lo que el pro-ducto de la venta del inmueble debe reputarse ganancial. Añade que al momento de la división de bienes gananciales se debe aplicar el principio de unicidad patrimonial reco-nocido por este Tribunal en Toppel v. Toppel, ante.
II
La relación anterior pone sobre el tapete la naturaleza de la controversia que debemos atender. La parte recurrida reconoce que el traspaso de titularidad se realizó conforme a las leyes de Florida, por lo que no se cuestiona la validez de esa transacción para efectos de la venta a un tercero. El asunto a dilucidar es qué normas deben aplicar al liquidar una Sociedad Legal de Bienes Gananciales cuando un bien, que se alega forma parte del caudal, está sito en una juris-dicción distinta de aquella donde se decretó el divorcio y se realiza la división, y existe un conflicto de leyes entre las *144 jurisdicciones que incide sobre la división. Ello nos lleva, necesariamente, a abordar esta controversia desde la pers-pectiva del derecho internacional privado.
A.
Las transformaciones sociales de las últimas décadas han propiciado una mayor capacidad móvil de las nuevas generaciones. Este fenómeno, cada vez más presente, se alza como un aspecto imprescindible para comprender los cambios sociales y las transformaciones que acontecen en las sociedades modernas y postindustriales. M. Castells, La era de la información: economía sociedad y cultura, Madrid, Ed. Alianza, 2005, Vol. I. Sus causas son variadas: la globalización, la individualización y el desarrollo de nue-vas tecnologías de la comunicación se identifican como al-gunas de ellas. Su impacto, por otra parte, se manifiesta no tan solo en la esfera económica y política, sino también en la esfera familiar. Véase www.jobmob-and-famlives.eu (úl-tima visita, 4 de agosto de 2011).
Ya es usual que un matrimonio, durante su vigencia, establezca su domicilio en más de una jurisdicción. Esto supone nuevos retos para los ordenamientos legales en la medida en que las normas sobre las relaciones económicas entre los cónyuges varían de jurisdicción en jurisdicción, al punto de generar normas conflictivas al momento de deter-minar cómo se clasifican y se dividen los bienes adquiridos durante el matrimonio para propósitos de la liquidación de la comunidad posganancial.
El caso ante nuestra consideración presenta, precisa-mente, un problema de conflicto de leyes generado por el traslado de las partes —mientras estaban casadas— al es-tado de Florida, y la adquisición allí de un inmueble y su posterior traspaso a uno de los cónyuges conforme permi-ten las leyes del estado de Florida. La solución que el Tri *145 bunal ofrece para resolver este conflicto no es la adecuada para estos tiempos. Ello, pues ignora las tendencias moder-nas en materia de derecho internacional privado de familia y se aferra a una doctrina que no fue concebida para el procedimiento de división de bienes gananciales. Veamos.
B.
Cada jurisdicción determina cómo sus tribunales van a atender las controversias sobre conflicto de leyes. 1 Restatement of the Law (Conflicts of Laws) 2d Sec. 6 (1971). En nuestro ordenamiento, estas reglas están recogidas princi-palmente en los Artículos 9-11 del Código Civil. En lo per-tinente, el Artículo 9, denominado estatuto personal, esta-blece que la ley del domicilio de la persona aplica a los derechos y deberes de familia, o al estado, condición y ca-pacidad legal. 31 L.P.R.A. sec. 9. Por su parte, el Artículo 10, ante, conocido como el estatuto real, recoge el principio lex rei sitae y atiende el conflicto de leyes sobre bienes: “Los bienes muebles están sujetos a la ley de la nación del pro-pietario; los bienes inmuebles, a las leyes del país en que están sitos.”
La opinión mayoritaria determina que el bien inmueble sito en Florida es privativo al aplicar a esta controversia el estatuto real, así como la cláusula de entera fe y crédito de la Constitución de Estados Unidos. Ello así, pues concluye que conforme a nuestro estatuto real, la transferencia de titularidad del inmueble sito en Florida por parte de los cónyuges a favor de uno de ellos es un negocio jurídico válido según las leyes de ese estado. En un confuso análi-sis, el Tribunal aplica el principio lex rei sitae al procedi-miento de división de comunidad de bienes postganancial para decretar que ese inmueble es de carácter privativo. De este modo, el Tribunal adjudica la naturaleza privativa del inmueble a base del título de propiedad únicamente, *146 sin considerar las normas de clasificación de Puerto Rico o de Florida.(1)
Añade el Tribunal que la determinación de si existe un crédito por el dinero utilizado para la adquisición del bien y el pago de la hipoteca, deberá regirse por la ley del lugar donde la pareja tenía su domicilio conyugal al momento de adquirir la propiedad y de realizar el traspaso. Devuelve entonces el caso al Tribunal de Primera Instancia para que determine el domicilio conyugal y aplique la ley de esa ju-risdicción a la adjudicación del crédito sobre el inmueble sito en Florida. No comparto este razonamiento.
De una lectura de las normas estatutarias de los Artí-culos 9 al 11 del Código Civil, ante, se deduce que estas reglas generales no contemplan expresamente un meca-nismo para atender el conflicto móvil en cuanto a la divi-sión de bienes como resultado de un divorcio. Por una parte, se podría argumentar que este procedimiento pos-matrimonial se debe regir por el estatuto personal, pues es un asunto relativo al matrimonio. Por otro lado, la división de bienes incide directamente sobre el patrimonio de los excónyuges, lo cual podría justificar la aplicación del esta-tuto real.
El Tribunal decide que se debe aplicar el estatuto real porque, a su entender, así lo dicta el Artículo 10 del Código Civil, ante. Sin embargo, no nos enfrentamos a una contro-versia sobre la titularidad del inmueble, sobre la validez del contrato que los cónyuges otorgaron entre sí en Florida o sobre el reconocimiento de este acto en nuestra jurisdicción. Se trata de determinar si procede incluir el inmueble sito en Florida, o el dinero obtenido de la venta al tercero, en el inventario del caudal que ha de ser dividido. Para ello, debemos determinar antes la naturaleza, priva-tiva o ganancial, del dinero obtenido de la venta del inmue- *147 ble sito en Florida. Lamentablemente el Tribunal no com-prende adecuadamente la diferencia entre un asunto y otro para efectos de la norma que adopta.
La experiencia de los tribunales ha demostrado que la aplicación mecánica de estas disposiciones a controversias que surgen en el derecho de familia podría culminar en resultados inadecuados. Así lo reconoce la doctrina, por lo que se han desarrollado normas específicas para atender los conflictos de leyes en este ámbito del derecho. Ante la ausencia de una disposición en nuestro ordenamiento jurí-dico que atienda este asunto de derecho internacional pri-vado, establecimos la norma en Toppel v. Toppel, ante. Re-pasemos la norma allí pautada, ya que ésta gobierna a la controversia que hoy atendemos.
C.
En Toppel v. Toppel, ante, un hombre estadounidense re-sidente de Nueva Jersey y una mujer británica contrajeron matrimonio en el estado de Nueva York. Al poco tiempo, la pareja se trasladó a Puerto Rico donde estuvieron domicilia-dos por la mayor parte de la duración del matrimonio. Pos-teriormente, obtuvieron una sentencia de divorcio en Puerto Rico y procedieron a la división posmatrimonial de sus bienes. Al enfrentarnos a un posible conflicto de leyes, reco-nocimos que existía un vacío en nuestro ordenamiento en cuanto a la norma de derecho internacional privado que aplica a un procedimiento de partición de bienes. En tal sen-tido aseveramos: “El hecho de que el divorcio era descono-cido en España para el tiempo en que se aprueba el Código Civil basta de por sí para demostrar que, al menos en cuanto a tal aspecto, estamos ante una laguna de la ley.” Toppel v. Toppel, ante, pág. 782. Nuestra normativa estatua-ria no ha variado o modificado este hecho.
Luego de evaluar las tendencias doctrinales de la época, adoptamos la doctrina del centro de los intereses matrimo- *148 niales atemperada a la teoría estadounidense de los con-tactos dominantes o relación significativa para determinar la ley que rige los bienes matrimoniales. Toppel v. Toppel, ante, pág. 791. En ambas, el domicilio conyugal o residen-cia habitual es un factor determinante, pero no es el único que se ha de considerar. Al amparo de esta norma, ordena-mos la división de la masa de bienes de la comunidad con-forme a la ley de la jurisdicción que fue el centro de inte-reses de la pareja conyugal durante la vigencia del matrimonio.
Por otro lado, para determinar el centro de intereses conyugal indicamos que se deben examinar varios factores además del domicilio. Entre éstos, se encuentran los inte-reses siguientes: la localización principal de los intereses financieros (inversiones e ingresos), los lazos afectivos, la duración de la residencia, la nacionalidad de los cónyuges, las necesidades de los sistemas interestatal e internacio-nal, las políticas relevantes de los foros afectados, la pro-tección de expectativas justificadas, la previsibilidad y uni-formidad del resultado en situaciones análogas, la protección de la parte más débil, además de la facilidad en la determinación y aplicabilidad de la regla más justa. Toppel v. Toppel, ante, págs. 791-792.
De este modo, acogimos la regla de mutabilidad que per-mite que, luego de contraer matrimonio bajo un régimen económico supletorio, los cónyuges lo modifiquen bajo cier-tas circunstancias. Nos alejamos así de la regla de la inmu-tabilidad que considera que el régimen seleccionado a la fecha cuando se contraen nupcias aplicará siempre a la relación entre los cónyuges durante el matrimonio, e in-cluso a los procedimientos posteriores a su disolución.
Sin embargo, ello no significa que cada bien se clasifi-cará y dividirá de forma individual, según el lugar donde radiquen los intereses o la pareja establezca su domicilio a la fecha de adquisición. Por esta razón, incorporamos el principio de unicidad patrimonial para tratar todos los bie- *149 nes como una masa que se divide al amparo de una sola ley. Al preparar el inventario, tanto los bienes muebles como los bienes inmuebles se clasifican, según las normas de la ley bajo la cual se hace la división.
Los excónyuges Roselló Puig y Rodríguez Cruz son puer-torriqueños que contrajeron matrimonio en Puerto Rico bajo el régimen supletorio de la Sociedad Legal de Bienes Gananciales. Durante el matrimonio, se establecieron en el estado de Florida por un periodo prolongado. Posterior-mente, regresaron a Puerto Rico, donde se divorciaron y se encuentran actualmente en el procedimiento de división de bienes. Como parte de esta acción, surgió la controversia sobre la clasificación del bien inmueble sito en Florida, cuya titularidad fue transferida a favor de la señora Rodrí-guez Cruz y que ella vendió a un tercero.
Luego del divorcio, la masa de bienes matrimoniales se debe entender como una sola unidad para propósitos de establecer la ley aplicable a la división de bienes matrimoniales. Conforme se discutirá más adelante, por razones de justicia y economía procesal, esta ley debe regir tanto la clasificación de los bienes como el procedimiento de división. Afín con el principio de unicidad patrimonial, todos los bienes, incluyendo los adquiridos fuera de Puerto Rico, se deben clasificar según la ley aplicable al procedi-miento de división.
Coincidimos con la opinión mayoritaria en que el Tribunal de Primera Instancia no ha determinado cuál fue el domicilio conyugal durante el matrimonio. De igual modo, no ha decretado cuál fue el centro de intereses. Siendo ello así, se debe devolver el caso al foro primario pero para que se determine cuál fue el centro conyugal de intereses a la luz de Toppel v. Toppel, ante. A base de esa determinación se decidirá la ley aplicable para el procedimiento ante su consideración, lo que incluye tanto la clasificación de los bienes como su división. De considerar el foro primario que el matrimonio tuvo más de un centro de intereses, debe *150 aplicar entonces la ley del foro si éste es uno de ellos, ya que tiene jurisdicción sobre ambas partes y es la ley que mejor conoce.
III
Pese a lo anterior, el Tribunal se niega a aplicar a este caso lo decidido en Toppel v. Toppel, y procede a revocar este precedente. La mayoría considera que la norma esta-blecida en Toppel v. Toppel es contraria al historial legisla-tivo del Código Civil. Al descartar la normativa vigente, realiza una aplicación defectuosa de nuestras reglas de de-recho internacional privado. Así, sostiene que su interpre-tación del estatuto real responde a la práctica estadouni-dense de extender el principio lex rei sitae a cualquier controversia sobre bienes.
Por considerar que el Tribunal incide en su razona-miento, y ante la falta de discusión en la opinión sobre la doctrina de derecho internacional privado aplicable a la controversia que enfrentamos hoy, consideramos necesario examinar cómo se ha desarrollado este tema en otras jurisdicciones. Además, atenderemos en detalle los funda-mentos deficientes que se invocan para revocar Toppel v. Toppel.
A.
El derecho internacional privado reconoce la mutabili-dad e inmutabilidad del régimen económico matrimonial como principios generales aplicables para atender conflicto de leyes que se suscitan sobre bienes matrimoniales. El principio de inmutabilidad establece que los cónyuges se-leccionan un régimen económico a la fecha del matrimonio y esa será la ley aplicable durante la vigencia del matrimo-nio y para la división de bienes. K. Kroll, Unification of Conflict of Laws in Europe en European Challenges in Con *151 temporary Family Law (Katharina Boele-Woelki y Tone Sverdrup, eds.), Portland, Ed. Intersentia, 2008, pág. 381; T. Oldham, What if the Beckhams move to L.A. and Divorce? Marital Property Rights of Mobile Spouses When They Divorce in the United States, 42 Fam. L.Q. 263, 265 (2008). Esta es la práctica mayoritaria en los países europeos. Kroll, op. cit. Se reconoce que este principio ofrece el beneficio de la estabilidad y previsibilidad de la ley aplicable, pero presenta el problema de atentar contra la voluntad de las partes de adoptar el régimen de la nueva jurisdicción en la que se establecieron. Además, implica que el tribunal del foro aplicaría una ley que, como norma general, no conoce con profundidad. Oldham, ante; Marsh, op. cit., pág. 106.
Por su parte, el principio de mutabilidad reconoce el de-recho de la pareja conyugal a modificar el régimen econó-mico que regía a la fecha de contraer nupcias si se traslada a otra jurisdicción .y concurren ciertos factores. Marsh, op. cit., pág. 104. Por ejemplo, el Artículo 7 de la Convención de la Haya de 1978 sobre la Ley Aplicable a Regímenes de Propiedad Matrimonial, considera esta posibilidad cuando los cónyuges cambian su residencia habitual al país de su nacionalidad común o cuando permanecen en esa jurisdic-ción por un periodo mínimo de diez años. Convención de la Haya sobre la Ley Aplicable a Regímenes de Propiedad Matrimonial, Art. 7, 1978;(2) Kroll, op. cit., pág. 381. La doctrina de la mutabilidad es bien recibida en un número creciente de jurisdicciones, pues respeta la autonomía de la voluntad de los cónyuges.
En Estados Unidos, la mutabilidad tuvo mejor acepta-ción como principio que rige el régimen económico matrimonial y su posterior división. Esta preferencia se debió, principalmente, al respeto a la voluntad de las personas *152 que comenzaban una nueva vida en Estados Unidos y a facilitar la determinación de la ley aplicable en un país donde, desde sus inicios, sus habitantes eran inmigrantes. Marsh, op. cit., pág. 107; Oldham, ante, pág. 288.
Asimismo, la doctrina reconoce varias modalidades o ti-pos de mutabilidad. La mutabilidad parcial se refiere al principio que establece que los intereses propietarios de los cónyuges sobre bienes adquiridos durante la vigencia del matrimonio se determinan según las leyes del domicilio matrimonial a la fecha de adquisición. F.K. Juenger, “Marital Property and the Conflicts of Laws: A Tale of Two Countries”, 81 Colum. L. Rev. 1061, 1073 (1981). De este modo, una pareja que cambia de domicilio modifica el régi-men económico matrimonial bajo el que contrajo matrimo-nio para conformarlo al sistema supletorio del nuevo domicilio. Sin embargo, este cambio es efectivo solamente respecto a los bienes adquiridos en el segundo domicilio. Quienes favorecen este proceso señalan que así se protegen los derechos adquiridos y las expectativas de las partes. Marsh, op. cit., pág. 109.
Ahora bien, solo algunas jurisdicciones estatales han extendido la mutabilidad parcial a la división postdivorcio de bienes. Oldham, ante, pág. 268. Se requiere que el tribunal establezca el domicilio conyugal a la fecha en que se adquirió cada bien para aplicarle la ley de división de bie-nes de esa jurisdicción. Es decir, este proceso requiere que el foro en el cual se realiza la división aplique más de una ley, lo cual afecta la economía procesal y aumenta la carga económica para las partes en el litigio. Id.; Juenger, ante, pág. 1073.
De otra parte, la mutabilidad completa implica que la división de la totalidad de los bienes se realiza conforme a la ley del lugar donde se decretó el divorcio. Oldham, What if the Beckhams move to L.A. and Divorce ?, ante, pág. 269; Marsh, op. cit., pág. 104. Al igual que con el principio de inmutabilidad, el tribunal examina solamente una ley *153 para adjudicar los derechos de las partes, con la diferencia de que estaría aplicando, normalmente, la ley de su jurisdicción. Oldham, ante. Un número considerable de las jurisdicciones estatales de Estados Unidos aplican esta norma. Marsh, op. cit, pág. 104; J.T. Oldham, Divorce, Separation and the Distribution of Property, New York, Ed. Law J. Seminars-Press, 1996, Sec. 13.01[5].
El profesor J. Thomas Oldham advierte que la mayoría de los estados que aplican la mutabilidad completa no exi-gen un periodo mínimo de residencia o que ese sea el do-micilio matrimonial habitual, por lo que se puede prestar para la práctica de selección del foro (forum-shopping). Ol-dham, What if the Beckhams move to L.A. and Divorce?, ante, pág. 271. Por lo tanto, recomienda que estos foros deben exigir unos contactos mínimos entre las partes y la jurisdicción antes de aplicar su ley. Id. Es menester seña-lar que la doctrina de mutabilidad completa entra en juego únicamente después de que se decreta el divorcio, por lo que este mecanismo no altera los derechos propietarios de las partes sobre los bienes durante la vigencia del matrimonio. Oldham, What if the Beckhams move to L.A. and Divorce?, ante, pág. 269.
Valga señalar que, en tiempos recientes, se han desarro-llado otras vertientes del principio de mutabilidad, la dife-rencia entre unas y otras es la relación entre las partes en el pleito y la ley que aplicaría para el procedimiento de división. Una modalidad sería aplicar la ley del último lu-gar de residencia común, pues se entiende que ese régimen es la última voluntad compartida. Oldham, What if the Beckhams move to L.A. and Divorce?, ante, págs. 289 — 292. Otras jurisdicciones de Estados Unidos han resuelto el pro-blema del conflicto de leyes en la división de bienes apli-cando la teoría del estado con “mayor relación significati-va”, según los criterios establecidos en el Restatement of the Law, ante. Esta teoría establece que cuando una juris-dicción no ha promulgado una ley para atender expresa- *154 mente un conflicto de leyes, se deben considerar una serie de factores para determinar qué ley aplicará. Restatement of the Law, ante, Vol. 1, Sec. 6.(3) Sin embargo, esta doc-trina responde principalmente al interés de proteger dere-chos propietarios, por lo que los tribunales estatales no la han aplicado de forma uniforme. Oldham, What if the Bec-khams move to L.A. and Divorce?, ante, págs. 272-273.
De otra parte, algunos tribunales evitan el análisis de estas normas y aplican el principio lex fori del derecho in-ternacional para dividir los bienes matrimoniales conforme a la ley del foro cuando tienen jurisdicción personal sobre ambas partes. B.R. Turner, Equitable Distribution of Property, 3ra ed., West Group, 2005, Vol. 1, Sec. 3:13, págs. 158-160. Sin embargo, este proceder permite que cada cón-yuge seleccione el foro que mejor convenga a sus intereses, lo que a su vez podría resultar que se litigue simultánea-mente un mismo asunto en más de un tribunal.
B.
En el día de hoy, el Tribunal revoca Toppel v. Toppel, por considerar que este precedente es contrario al historial le-gislativo del Código Civil. Asevera la mayoría, sin apoyo alguno más allá de la mera aseveración, que la enmienda al Artículo 10 del Código Civil de 1902 tuvo la intención de que se aplicara el estatuto real a toda controversia posible que surgiera sobre bienes inmuebles, ya que, según la ma-yoría, “debimos interpretar el artículo a la luz de la nueva realidad puertorriqueña que esbozó nuestra Asamblea Le- *155 gislativa en 1902”. Opinión mayoritaria, pág. 103. De este modo, sugiere que la interpretación de nuestro estatuto real se debe adecuar al desarrollo estadounidense del prin-cipio lex rei sitae y que ello conlleva la aplicación de este principio a cualquier controversia relativa a los bienes. El Tribunal no tiene razón.
La Comisión Codificadora del Código Civil de 1902 no contempló el asunto de autos, pues la enmienda no perse-guía ese propósito. Don Luis Muñoz Morales nos explica con claridad qué se perseguía:
En el título preliminar (art. 10) se mantiene el principio de que los bienes muebles se rigen por la Ley de la Nación del propietario (estatuto personal), y los inmuebles por las del país en que están sitos (estatuto real); pero se suprime la ex-cepción contenida en el artículo concordante del Código Espa-ñol respecto al caso de sucesión hereditaria. L. Muñoz Morales, Reseña histórica y anotaciones al Código Civil de Puerto Rico: Libro I, San Juan, Ed. U.P.R., 1947, pág. 25.
El propósito de la enmienda, por lo tanto, fue eliminar la disposición que declaraba que las sucesiones se regían por el estatuto personal. Nada más. Adscribirle otra inten-ción a la modificación del artículo introducida en 1902 es desnaturalizar la realidad histórica. Y si esa desfiguración se utiliza para rechazar y descartar el cuidadoso análisis de Toppel v. Toppel no podemos menos que llamar la aten-ción a tan lamentable análisis. Es evidente que existe un vacío legal sobre qué norma se debe aplicar a la división de bienes postmatrimoniales. Con lo cual, nada de lo resuelto en Toppel v. Toppel es contrario al historial del Código Civil o a la intención legislativa de la enmiendas del 1902. Por lo que el fundamento de la mayoría para revocar a Toppel v. Toppel no se justifica jurídicamente.
La mayoría surca otro camino en su intento de menguar la actualidad de Toppel v. Toppel. El resultado es igual-mente defectuoso. Asegura que la enmienda al Artículo 1277 del Código Civil de 1987 tuvo el efecto de rechazar el principio de unicidad patrimonial que estableció Toppel v. *156 Toppel. 31 L.P.R.A. sec. 3561. Esta disposición establece que cuando una persona puertorriqueña contrae matrimo-nio con una extranjera, fuera de Puerto Rico, sin que me-dien capitulaciones, aplica la ley del lugar donde estable-cieron su domicilio conyugal, tomando en cuenta otros factores que en justicia deban considerarse. Colige la opi-nión mayoritaria que al cerrar la disposición con la frase “todo sin perjuicio de lo establecido en este título respecto a los bienes inmuebles” se pretendió rechazar el principio de unicidad del patrimonio matrimonial. Sin embargo, esta frase estaba incluida en la versión anterior del Artículo 1277, por lo que no representa una modificación en reac-ción a lo resuelto en Toppel v. Toppel.
El propósito de esta medida fue “enmendar el Artículo 1277 del Código Civil de Puerto Rico, según enmendado, a fin de eliminar el discrimen por razón de sexo que establece dicho artículo en los matrimonios celebrados en país ex-tranjero en que uno de los contratantes es puertorriqueño y el otro es extranjero”. (Enfasis nuestro.) Ley Núm. 4 de 5 de marzo de 1987, 1987 Leyes de Puerto Rico 12-13. La rea-lidad es que la posible convergencia entre esta disposición y el estatuto real no fue lo que motivó la enmienda. No se puede inferir un rechazo de la Legislatura al análisis que Toppel v. Toppel hace del estatuto real por el mero hecho de mantener la porción referente al estatuto real. Por lo tanto, es errada la aseveración del Tribunal de que con la enmienda de 1987 al Artículo 1277 del Código Civil, “la Asamblea Legislativa rechazó directamente la interpreta-ción que del Art. 10 del Código Civil, supra, se realizó en Toppel v. Toppel ...”. Opinión mayoritaria, págs. 107-108.
Por el contrario, la enmienda al Artículo 1277 se debe entender como una aceptación por parte de la Legislatura a lo establecido en Toppel v. Toppel. Como ya se ha seña-lado, la referencia al estatuto real que permaneció en el artículo luego de la enmienda, en nada afecta la norma adoptada en Toppel v. Toppel. Más aún, desde entonces *157 aclaramos que la norma allí establecida se circunscribía al ámbito de la relación ínter vivos de los excónyuges y sos-tuvimos la importancia del estatuto real en otras áreas del derecho. Toppel v. Toppel, ante, pág. 784. Además, la pro-pia opinión mayoritaria reconoce que la Legislatura adoptó los principios esbozados en Toppel v. Toppel sobre conflicto móvil y centro de intereses. Es decir, la opinión del Tribunal invoca fundamentos para sostener su posición que no encuentran apoyo en nuestra realidad histórico-jurídica.
Como vemos, la opinión mayoritaria revoca Toppel v. Toppel amparándose en unas actuaciones legislativas que verdaderamente no son incompatibles con la norma esta-blecida en este precedente. Lamentablemente, este proce-der no tan solo se fundamenta en presupuestos erróneos sino que retrocedemos y retomamos doctrinas de una pa-sado ya superado. Me explico.
C.
La doctrina y jurisprudencia que la opinión cita para sostener la aplicabilidad del estatuto real al caso de autos versa sobre la titularidad o la validez de los negocios jurí-dicos que se realizan sobre bienes inmuebles durante el matrimonio. Por ejemplo, la opinión mayoritaria nos re-fiere al tratado del profesor Raleigh C. Minor, el cual ex-plica que
“... Cada Estado hace lo que está a su alcance con el fin de que sus leyes que afectan a la entrega, traspaso y gravamen de bienes inmuebles situados dentro de sus límites sean lo más terminantes y precisas posibles. ... Y es sumamente impor-tante que las inscripciones legales de dichas transacciones las cuales constituyen series de títulos a los bienes inmuebles, se conserven libres de toda censura, irregularidad o confusión con los requisitos de otros Estados.
“Por tanto viene a ser especialmente parte de la política de todo Estado el no permitir que se verifique ninguna transac-ción relativa al traspaso de cualquier derecho o título a la pro-piedad inmueble que radica en dicho Estado si con ello se in *158 fringe su propia ley ya sea o n[o] v[á]lida de acuerdo con las leyes de Estados extranjeros. (Énfasis suplido.)(4)
Conforme a este texto, el principio lex rei sitae persigue la protección de intereses de índole comercial y registral. Se trata del interés gubernamental de poder determinar con previsibilidad la titularidad de los bienes y en mante-ner la estabilidad de los negocios jurídicos que toman lugar dentro de su territorio.
Cónsono con lo anterior, en Babilonia v. Registrador, 62 D.P.R. 688 (1943), aplicamos el estatuto real a una contro-versia sobre bienes matrimoniales. En ese recurso guber-nativo se solicitó modificar una constancia sobre titulari-dad de un bien en el Registro de la Propiedad al amparo de una ley extranjera. De este modo, resolvimos que las tran-sacciones sobre bienes inmuebles que realiza una persona con posterioridad a su matrimonio, se rigen por el estatuto real. Es crucial notar que, nuevamente, el asunto medular recaía sobre la titularidad de un bien inmueble. Sin embargo, la controversia que debemos resolver hoy no nos re-fiere a esta área del derecho. Los intereses que inspiran las normas sobre derechos propietarios de titularidad son dis-tintos a los relativos a la división de bienes.
Aunque cada jurisdicción establece el procedimiento de división de bienes matrimoniales que sus tribunales utili-zan, existe consenso en que el fin es la repartición justa de cargas y beneficios. A.F. Bock, Dividing the Assets Upon the Dissolution of a Marriage: A Comparison Between Legal Systems Which Apply a “Hard and Fast Rule” and Systems with a Discretionary Approach to the Division of Assets en European Challenges in Contemporary Family Law, Portland, Ed. Intersentia, 2008, pág. 289; Turner, op. cit., Sec. 2:2. Los principios generales que rigen estos procedimien-tos son: la no discriminación por género, el reconocimiento de la contribución de cada cónyuge a los asuntos de la fa- *159 milia, la protección de intereses legítimos y la asunción de responsabilidad. Bock, op. cit., págs. 289-290. Asimismo, se considera un valor importante que la adjudicación de la división sea eficaz y predecible. Bock, op. cit., pág. 290; Turner, op. cit.
Resulta meridianamente claro que el estatuto real man-tiene su relevancia en materia de derechos propietarios, in-cluso cuando se trata de bienes matrimoniales. Sin embargo, la división de bienes matrimoniales posdivorcio protege intereses y derechos que no necesariamente coinci-den con los derechos propietarios de los cónyuges.(5) Debe-mos entonces hacer eco de las sabias palabras del Juez Pre-sidente Señor Trías Monge cuando aseveró que “[d]ebe distinguirse entre diferentes situaciones conflictuales, aun dentro del mismo campo. Los valores envueltos en situacio-nes distintas o aun superficialmente similares son numero-sos y la relación entre ellos varía a menudo.” Toppel v. Top-pel, ante, pág. 790.
D.
Si bien algunas jurisdicciones en Estados Unidos exten-dieron el principio lex rei sitae al derecho de familia, la rigi-dez de este principio se matizó prontamente por la doctrina de la procedencia de los fondos (source of funds). Véanse: Restatement of the Law, ante, Secs. 238 y 259; H. Marsh, Marital Property in Conflict of Laws, Seattle, U. of Washington Press, 1952, pág. 102; Turner, op. cit., Sec. 5:21, págs. 342-350.(6) Esta última regla dictamina que un bien se cla- *160 sifica como privativo o matrimonial, según la caracteriza-ción del dinero utilizado para su adquisición. Es decir, un bien inmueble que se compra con dinero privativo mantiene su caracterización aunque la adquisición ocurra durante el matrimonio. Marsh, op. cit., pág. 102. De igual forma, si un bien se adquiere con bienes privativos y con bienes matri-moniales, el interés sobre el bien se mantiene en la misma proporción que la aportación del matrimonio y del cónyuge particular.
El efecto práctico de esta doctrina es que un bien inmue-ble tiene la misma naturaleza, privativa o matrimonial, que tenía el dinero utilizado para su adquisición. Como señala nuestro estatuto real y el Restatement, los bienes muebles se rigen por el domicilio de su propietario o el estado con mayor relación significativa. Restatement of the Law, ante, Sec. 258. Por lo tanto, los estados no aplican el principio lex rei sitae propiamente, sino que clasifican los inmuebles igual que los bienes muebles adquiridos durante ese tiempo.
La doctrina también se ha alejado de la aplicación me-cánica del lex rei sitae en los procedimientos de división, por las complicaciones que suscita. Imaginemos por un mo-mento qué pasaría si una pareja compra durante la vigen-cia del matrimonio bienes inmuebles en múltiples jurisdicciones. En ese caso, el tribunal tendría que estudiar y aplicar las leyes de cada lugar donde ubican los bienes inmuebles, aunque el matrimonio no haya residido allí. Lo anterior implicaría una carga demasiado onerosa para el tribunal y las partes en el litigio. Igualmente, el tribunal tendría que determinar si la pareja cambió de domicilio durante la vigencia del matrimonio y, de ser así, aplicar la ley de esa jurisdicción a los bienes muebles adquiridos du-rante ese tiempo.
*161 E.
Por otra parte, el Tribunal afirma que nuestro Código Civil incorporó “el principio general del derecho estadouni-dense respecto a que los bienes inmuebles se regulan total-mente por la ley del lugar donde estén sitos”. (Enfasis en el original.) Opinión mayoritaria, pág. 103. Al partir de esa premisa, determina que el bien inmueble sito en Florida era privativo porque solamente un cónyuge ostentaba la titularidad exclusiva del bien. Su análisis falla precisa-mente porque sugiere que la aplicación del principio lex rei sitae responde a una supuesta práctica uniforme en Esta-dos Unidos. Ello no es cierto.
En la actualidad, la doctrina estadounidense prevale-ciente reconoce esta distinción y limita, en este ámbito, la aplicación del principio lex rei sitae a la determinación del título legal. Turner, op. cit., Sec. 3:13. Empero, este princi-pio no se extiende a la etapa de distribución de bienes ma-trimoniales, pues la mayoría de las jurisdicciones estado-unidenses no toman en consideración la titularidad al decretar la división posdivorcio. Id. Un estudio de la reali-dad jurídica en Estados Unidos deja de manifiesto que no hay un procedimiento uniforme para la caracterización de bienes o su división posmatrimonial. Tampoco existe uni-formidad para atender controversias de conflicto de leyes.
Actualmente hay nueve estados(7) cuyo régimen econó-mico matrimonial es la comunidad de bienes, mientras que los otros cuarenta y un estados mantienen la doctrina de separación de bienes, propia del derecho común. Además, aun en estos dos sistemas no hay dos estados con normas iguales. Por ejemplo, cada estado tiene sus propias reglas para preparar el inventario de bienes divisibles y adjudicar la división.
*162 Una minoría de los estados se rige por un sistema de comunidad de bienes, en ausencia de capitulaciones. Las le-yes de estos estados siguen la tradición civilista, por lo que establecen un régimen similar a nuestra sociedad legal de gananciales que surte efectos desde la fecha del matrimonio. La protección que ofrece este sistema se observa en la par-ticipación como comuneros de derechos propietarios sobre los bienes adquiridos durante la vigencia del matrimonio. Oldham, Divorce, Separation and the Distribution of Property, op. cit., Sec. 3.02[5]; B.A. Smith, The Partnership Theory of Marriage: A Borrowed Solution Fails, 68 Tex. L. Rev. 689, 697-698 (1990). La comunidad también afecta los derechos de los cónyuges una vez se disuelve el matrimonio, sea por muerte o por divorcio. Turner, op. cit., Sec. 2:4.
En cuanto a la partición, la mayoría de los estados de comunidad aplica la norma de división de bienes comunes por partes iguales y otorga los bienes privativos exclusiva-mente a su titular original. Id., pág. 71. Unos pocos de estos estados contemplan la distribución equitativa cuando las circunstancias lo ameritan, lo cual puede favorecer por-centualmente más a uno de los cónyuges. No obstante, existen diferencias en las leyes de estos estados sobre la caracterización de ciertos bienes y otras particularidades del procedimiento de división.
Las jurisdicciones de derecho común adoptaron leyes de distribución de bienes recientemente. El derecho común puro en materia de familia establecía que el matrimonio no surtía efectos sobre los derechos propietarios de los cónyuges. Los bienes que cada cual traía al matrimonio o adquiría durante su vigencia permanecían como bienes se-parados(8) del cónyuge adquirente en todo momento, in-cluso después de disuelto el matrimonio. Oldham, Divorce, Separation and the Distribution of Property, op. cit., Sec. *163 3.02[1]. Una esposa que no trabajaba fuera del hogar sola-mente tenía derecho a una pensión posdivorcio, si no tuvo culpa en la causal del divorcio. Id.; Turner, op. cit., Sec. 2:3. En la década de 1970 y 1980, la mayoría de los estados reformaron sus leyes de derecho de familia y acogieron la teoría de que los cónyuges son socios en el matrimonio. Cónsono con lo anterior, se promulgaron leyes para esta-blecer procedimientos de distribución equitativa para pro-teger al cónyuge dependiente, proveyéndole así estabilidad económica futura. Turner, op. cit., Secs. 1:3 — 1:5.
La distribución equitativa es un sistema de división de bienes posdivorcio en el que se reconoce un interés de cada cónyuge sobre los bienes matrimoniales. A diferencia de la comunidad, este sistema solamente surte efectos con poste-rioridad al decreto de divorcio y permite que el juez adjudi-que los bienes según la distribución que le parezca más equitativa, sin que tenga que ser por partes iguales. Algu-nos estados preparan el inventario de bienes divisibles a base de la totalidad de los bienes de los cónyuges, inclu-yendo aquellos adquiridos previos al matrimonio. Oldham, Divorce, Separation and the Distribution of Property, op. cit., Sec. 3.03[2].
La mayoría de los estados de derecho común clasifica los bienes para propósitos del inventario, entre matrimoniales y separados. Los bienes separados se adjudican según la titularidad, mientras que los bienes matrimoniales se dis-tribuyen de forma equitativa. Turner, op. cit., Sec. 2:9. Cabe señalar que como esta distinción no se hace hasta después de disuelto el vínculo matrimonial, durante el ma-trimonio cada cónyuge tiene derechos propietarios absolu-tos sobre sus bienes separados. Oldham, op. cit., Sec. 3.03[3]. Además, en ciertos casos, si el juzgador lo consi-dera justo, se permite que se adjudiquen bienes privativos de un cónyuge a favor del otro. Id., Sec. 3.04[4].
Nótese entonces que hay dos aspectos relativos al con-flicto móvil en las relaciones patrimoniales posmatrimo- *164 niales: la clasificación de bienes y el procedimiento de división. En este tenor, es preciso destacar que cada juris-dicción estatal tiene sus propias normas respecto a uno y otro tema. Ante esta realidad, la aplicación del principio lex rei sitae es inadecuada, pues puede causar que el pro-cedimiento posdivorcio resulte excesivamente complejo, engorroso y extenuante. Cabe preguntarnos qué pasaría en el supuesto de una familia que por razones de empleo se establezca inicialmente en un estado, pero cambie periódi-camente de domicilio. No hay dos estados con leyes exacta-mente iguales en cuanto al derecho que rige los bienes du-rante el matrimonio o la distribución posdivorcio.
Debemos subrayar que clasificar un bien para propósi-tos del inventario, según la ley del lugar de adquisición, para luego dividirlo según otra ley, ha producido resultados injustos para alguna de las partes, principalmente para el cónyuge dependiente. M. Chappell, A Uniform Resolution to the Problem a Migrating Spouse Encounters at Divorce and Death, 28 Idaho L. Rev. 993, 1000-1003 (1992). Por ejemplo, en un pasado, algunos tribunales de estados donde rige la comunidad de bienes aplicaban el principio lex rei sitae para clasificar los bienes al momento de diso-lución del matrimonio. Sin embargo, la división se hacía conforme a la ley del foro que tenía ante sí la división de los bienes. W.W. Bassett, Repealing Quasi-Community Property: A Proposal to Readopt a Unitary Marital Property Scheme, 22 U.S.F.L. Rev. 463, 467-469 (1988). Por esta ra-zón, la masa de bienes de la comunidad se limitaba a los bienes que se consideraban matrimoniales.
Como es propio del derecho común, los bienes adquiri-dos en un estado donde no regía la comunidad de bienes se consideraban separados. Los tribunales en estados de co-munidad, al aplicar el principio lex rei sitae e intentar adaptar el concepto a su sistema, les adjudicaban carácter privativo. íd. Esta práctica tuvo el efecto de que una mujer que había vivido con su esposo en un estado de derecho *165 común, pero que posteriormente se mudaban a un estado donde rige la comunidad de bienes, recibía una cantidad muy inferior a la que hubiera recibido de haberse clasifi-cado y dividido la totalidad de los bienes a la luz de una ley solamente. Bassett, op. cit., pág. 469.
Algunos estados, como California, donde rige la comuni-dad de bienes han atendido este conflicto de leyes me-diante legislación, al incorporar la doctrina de cuasicomu-nidad, una modalidad de la norma de mutabilidad. Se refiere a la caracterización que se le da, en un procedi-miento de división, a los bienes adquiridos fuera de la ju-risdicción del foro, pero que si se hubieran adquirido en la jurisdicción del foro se considerarían bienes de la comunidad.(9) La aceptación de esta normativa se observa en la proliferación de leyes similares en otros estados donde rige la comunidad matrimonial de bienes.(10)
La aplicación del principio lex rei sitae al procedimiento de división de bienes, requeriría que un tribunal tenga que estudiar y aplicar leyes del derecho de familia de múltiples jurisdicciones para clasificar y dividir cada bien. Es por ello que se considera que, cuando un conflicto se refiere a controversias internas entre cónyuges, se debe aplicar la misma ley a los bienes muebles e inmuebles. Marsh, op. cit., pág. 110. Asimismo, para evitar la aplicación defec-tuosa de una norma u otra, se favorece la utilización de una ley única para la clasificación y división de la totalidad de los bienes. A esta doctrina se le ha denominado el prin-cipio de unicidad patrimonial y es la práctica favorecida no tan solo en la mayoría de las jurisdicciones en Estados Unidos, Turner, op. cit., Sec. 3.13, pág. 159 esc. 7, sino tam-bién por los países civilistas.(11) En nuestro ordenamiento *166 impera esta normativa, la cual extendimos a casos en que hay conflicto de leyes en Toppel v. Toppel, ante, págs. 790-791, pero que hoy este Tribunal injustificadamente abandona.
IV
Contrario a lo que el Tribunal pretende afirmar, no cabe hablar de una norma uniforme en Estados Unidos sobre conflicto de leyes en el ámbito de división de bienes matrimoniales. Tampoco puede aseverarse que la práctica generalizada es la aplicación del principio lex rei sitae a los procedimientos de clasificación y división postdivorcio de bienes matrimoniales. El estatuto real no responde a los intereses relacionados a la división de bienes matrimoniales. Su propósito es cónsono con la protección de derechos propietarios, no así con el interés de dividir los bienes matrimoniales de forma justa y equitativa para ase-gurar la estabilidad económica futura de cada cónyuge.
Lo cierto es que cada jurisdicción adopta la doctrina o modalidad que le parece que mejor protege los intereses de las partes, entre otras consideraciones. Así hicimos en To-ppel v. Toppel, luego de considerar varias de las tendencias modernas en esta área. En conformidad con la doctrina del precedente, ésta es la norma de conflicto de leyes aplicable a la controversia de autos. No existe razón para abandonar esta norma, pues responde a la realidad de nuestros tiem-pos y a las corrientes doctrinales modernas.
Por todo lo anterior, disiento de la opinión de la mayoría de este Tribunal.

 Recordemos que, en nuestro ordenamiento, la titularidad activa una presun-ción sobre la naturaleza del bien que puede ser rebatida si se prueba que el dinero utilizado en la adquisición era ganancial.

 Hasta la fecha, Francia, Luxemburgo y Holanda son los únicos países que han ratificado la Convención de la Haya, información disponible en http: / / www.hcch.net/index_en.php?act=conventions.statuscid=87 (última visita, 19 de julio de 2011).

 El profesor J. Thomas Oldham señala que el Restatement of the Law resulta inadecuado para atender ciertos problemas de conflicto de leyes en el ámbito del divorcio, pues data de antes de las leyes de distribución equitativa. T. Oldham, What if the Beckhams move to L.A. and Divorce? Marital Property Rights of Mobile Spouses When They Divorce in the United States, 42 Fam. L.Q. 263, 272-273 (2008). El pro-fesor Brett Turner también ha criticado la aplicación de esta teoría, ya que algunos tribunales la utilizan solamente para la clasificación de los bienes, pero luego divi-den a base de la ley del foro. A su entender, se debe aplicar la misma ley para ambas etapas. B.R. Turner, Equitable Distribution of Property, 3ra ed., West Group, 2005, Vol. 1, Sec. 3.13 esc. 4.

 Opinión mayoritaria, págs. 99-100, citando a Raleigh C. Minor en Conflicts of Laws, según citado en Colón et al. v. El Registrador, 22 D.RR. 369, 373-374 (1915).

 El profesor Brett Turner comenta: “Inception of title is a reasonable principle of property and estate law, but as a rule of classification for purposes of divorce, it has become profoundly unpopular. Equitable distribution states have almost uniformly held that property is acquired whenever contributions create real value, and not only at the moment when legal title passes.” B.R. Turner, Equitable Distribution of Property, 3ra ed., Ed. Thomson/West, 2005, Sec. 3:13, pág. 163.

 Cabe destacar que el Restatement se publicó en 1971, antes de la proliferación de las leyes de distribución equitativa, además de que la discusión incluida se limita a los derechos propietarios del matrimonio o de cada cónyuge. Turner, op. cit, pág. 345.

 Estos estados son: Arizona, California, Idaho, Luisiana, Nevada, Nuevo México, Texas, Washington y Wisconsin.

 El término “separado” será utilizado para distinguir esta clasificación del derecho común del concepto “privativo”, propio de los ordenamientos donde impera la comunidad de bienes o nuestra Sociedad Legal de Gananciales.

 íd.; Turner, op. cit., Sec. 3:13.

 Véanse: Ariz. Rev. Stat. Ann. Sec. 25-318(A); Cal. Civ. Code Sec. 125; La. Civ. Code Ann. Art. Sec. 3526; N.M. Stat. Ann. Sec. 40-3-8(0(1); Tex. Fam. Code Ann. Sec. 7.002.

 Cabe destacar, sin embargo, que el principio lex rei sitae y la distinción entre los tipos de bienes mantiene su importancia en otros ámbitos de derecho, como en
*166 acciones relativas a la titularidad de un bien o a los derechos de terceras personas sobre bienes matrimoniales. Marsh, op. cit., pág. 110.